UNITED STATES ex rel., Christopher HALL, Plaintiff–Appellant,

v.

TELEDYNE WAH CHANG ALBANY; Teledyne Industries, Inc., dba Teledyne Wah Chang Albany and Teledyne, Inc., Defendants–Appellees.

No. 95–35693.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1996.

Decided Jan. 7, 1997.

As Amended on Denial of Rehearing and Rehearing En Banc March 19, 1997.

Steve W. Berman and Jeffrey T. Sprung, Hagens & Berman, Seattle, Washington, for the plaintiffs-appellants.

Brad D. Brian, Michael R. Doyen, and Ilana B. Rubenstein, Munger, Tolles & Olson, Los Angeles, California, for the defendants-appellees.

Before WRIGHT, SCHROEDER, and KLEINFELD, Circuit Judges.

SCHROEDER, Circuit Judge.

The district court dismissed a *qui tam* action against the defendant-appellee Teledyne Wah Chang Albany, Teledyne Industries, Inc., d.b.a. Teledyne Wah Chang Albany, and Teledyne, Inc. (collectively, "Teledyne"). The court did so because the plaintiff, Christopher Hall ("Hall"), had already sued Teledyne in state court and had settled, executing a release that also encompassed any future *qui tam* claim. After the district court's ruling, this court decided *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir.1995), where we held that a similar release in state litigation, entered into without the knowledge or consent of the United States, could not be enforced to bar a later *qui tam* claim.

The issue we now must decide is whether *Green* requires us to reverse the district court's ruling in this case. We hold that it does not because the rationale underlying *Green* does not apply here. Here, in contrast to *Green*, the government had full knowledge of the plaintiff's charges and had investigated them before Hall and Teledyne settled. Under these circumstances, there is no reason to hold that the release is unenforceable, and we therefore affirm.

## FACTUAL BACKGROUND

Hall worked as an engineer for Teledyne from 1978 to 1991. One of Hall's assignments involved the manufacture of zircaloy tubeshells, the primary containment sheath for nuclear fuel rods in nuclear reactors. In order to prevent corrosion and leaking in the tubeshells, Teledyne developed the Beta Quench process. In this process, the tubeshells were heated to extremely high temperatures. At a sufficiently high temperature, a chemical reaction took place that resulted in improved corrosion resistance. Teledyne sold the tubeshells to entities in the nuclear power industry, which in turn supplied the U.S. government. The customer specifications for the tubeshells included the heightened corrosion resistance. In addition, Teledyne affirmatively certified that the tubeshells had been heated to the temperature necessary for the chemical reaction.

Hall contends that the Beta Quench process was defective because it did not heat the tubeshells to the minimum temperature necessary for the chemical reaction; therefore, the tubeshells did not possess the certified corrosion resistance. In early April 1990, Hall voiced his concerns to Teledyne's management. Teledyne investigated the matter, and concluded that Hall's concerns were unfounded. In November 1990, Hall informed Teledyne that he would notify the appropriate federal agency if Teledyne refused to correct the alleged defects.

On January 14, 1991, Teledyne informed the Nuclear Regulatory Commission ("NRC") of Hall's concerns about the Beta Quench process, explained the basis for its conclusion that his concerns were unfounded, and described steps that it was taking to demonstrate the adequacy of the process. On January 22, 1991, Hall filed his own complaint with the NRC, stating that the tubeshells had not been properly heated, and therefore did not meet customer specifications.

The NRC informed Teledyne in November 1991 that after inspecting the samples and observing the heat treating of the tubeshells at the Beta Quench facility, it had determined that the tubeshells were in accordance with customer requirements. In addition, the NRC specifically noted that its "inspectors could not substantiate the allegations

concerning improper or inaccurate temperature measurement."

## STATE COURT ACTION FOR RETALIATION

In July 1990, shortly after Hall voiced his initial concerns to Teledyne, Teledyne allegedly fabricated deficiencies in his performance, and placed him on six months probation. On January 29, 1991, seven days after Hall filed his complaint with the NRC, Teledyne suspended him for three days on account of tardiness. Hall immediately filed a complaint with the U.S. Department of Labor ("DOL"), alleging that Teledyne had violated federal law by retaliating against him for reporting safety problems in the nuclear power industry. On February 28, 1991, the DOL found that Teledyne had indeed discriminated against Hall on the basis of Hall's participation in a protected activity. Teledyne apparently ignored the DOL's findings and fired Hall in July 1991.

Hall then initiated a state court action against Teledyne, alleging termination for whistleblowing, intentional infliction of emotional distress, fraudulent inducement to accept employment, and violation of the Oregon RICO statute. While he did not allege a *qui tam* claim under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, Hall clearly alleged that Teledyne had defrauded its customers, including the federal government, by falsely representing that the Beta Quench process effectively increased the corrosion resistance of the tubeshells. In December 1993, Hall and Teledyne settled the state suit for a substantial sum of money, and executed a broadly worded general mutual release. The release stated that it

> includes, but is not limited to, all claims which were, or could have been, brought as claims or counterclaims in the above-referenced action. This Mutual Release of Claims also includes, but is not limited to, any other claims or complaints which could have been brought in any other type of action or proceeding.

Neither Hall nor Teledyne informed the federal government of the state action or the release.

## PROCEEDINGS BELOW

In October 1994, Hall filed the instant *qui tam* action in federal district court against the same defendants named in his state action, alleging violations of the FCA. Hall's *qui tam* claim was based on the same allegations he had previously made in the state action: that Teledyne had falsely certified to its customers, including the United States, that its tubeshells had undergone the heat treatment necessary for heightened corrosion resistance. The NRC conducted another site inspection after the qui tam complaint was filed. It concluded that "the products were custom fabricated in accordance with the processes and specification established by the customer...." The United States declined to intervene in the qui tam action.

The district court granted summary judgment to Teledyne on the ground that the release executed in state court encompassed the *qui tam* action. To reach its decision, the court weighed the interests in enforcing the settlement and release agreement against the public interest underlying the FCA that would be preserved by nullifying it. *See Town of Newton v. Rumery*, 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987). The court concluded that because the government knew of and had investigated Hall's allegations prior to the release, the public interest in resolving disputes by settlement outweighed the public interest in permitting this FCA case to go forward.

## THE APPLICABILITY OF THE *GREEN* DECISION

Twenty-six days after the district court's entry of judgment for Teledyne, this court handed down *United States ex rel. Green, supra*, which addressed the enforceability of a *qui tam* claim release entered into without the United States' knowledge or consent. In *Green*, the plaintiff was discharged shortly after informing his employer that he had uncovered evidence of fraud on the federal government, and that he had sought legal advice. *Green*, 59 F.3d at 956. After filing an action for wrongful discharge in state court, Green and the employer entered into a settlement agreement and general release of all claims. At that time, the United States

was not aware of either Green's fraud allegations, or of the settlement and release agreement.

Eight months after executing the release, Green filed a *qui tam* action under the FCA, alleging fraud on the federal government under the same predicate facts he had alleged in his earlier state action. The United States investigated the matter for the first time and declined to intervene. The district court granted summary judgment to the employer on the ground that Green had already released his right to recover under the FCA. *Id.* at 957.

In reversing the district court's dismissal of the *qui tam* action in *Green,* we held that enforcing the release in that case would impermissibly impair the public interests underlying the FCA's *qui tam* provisions. *Id.* at 957, 962–69. We stated:

It is commonly recognized that the central purpose of the *qui tam* provisions of the FCA is to "set up incentives to supplement government enforcement" of the Act, *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 649 (D.C.Cir. 1994), by "encourag[ing] insiders privy to a fraud on the government to blow the whistle on the crime." *Wang v. FMC Corp.,* 975 F.2d 1412, 1419 (9th Cir.1992).

*Id.* at 963. We explained that a relator who properly brings a claim, will generally receive a share of the recovery as well as be eligible for attorneys' fees and costs, depending on the importance of the relator's participation in the action and the importance of the information the relator brings forward. *Id. See also* 31 U.S.C. § 3730(d). The effect of enforcing releases when the government has no knowledge of the *qui tam* claims would be to encourage relators to settle privately and release their claims, thus retaining 100 percent of the recovery, instead of providing the government with information and retaining at most the 30 percent recovery available in a *qui tam* action. *Id.* at 965–66; 31 U.S.C. § 3730(d)(2).

Our refusal to enforce the release in *Green* turned on the public interest in learning about claims of government contractor fraud, and upon the fact that in that case, the government had not been aware of Green's

allegations at the time of the settlement release. In fact, we deemed the question of the government's lack of knowledge "critical":

It is critical to observe ... that the government only learned of the allegations of fraud and conducted its investigation *because of the filing of the qui tam complaint.* If the prevailing legal rule were that prefiling releases entered into without the government's consent or knowledge were enforceable, then it stands to reason that Green would never have filed his *qui tam* complaint in the first place.

*Id.* at 966 (emphasis in the original). Thus, we concluded in *Green* that "prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." *Id.* at 969.

In this case, the concerns that led us to deny enforcement in *Green* are not present. The federal government was aware of Hall's allegations regarding false certifications. Therefore, the public interest in having information brought forward that the government could not otherwise obtain is not implicated. The public interest in the use of *qui tam* suits to supplement federal enforcement of the FCA is also not disturbed, because the federal government had already investigated the allegations prior to the settlement. There are, thus, no similar federal concerns in this case that would justify overriding the general policy in favor of encouraging parties to settle disputes. *See Rumery,* 480 U.S. at 392–97, 107 S.Ct. at 1192–94. The government, of course, was not a party to the release, and is therefore not barred by it from pursuing a claim against Teledyne.

Teledyne alternatively contends that we should overrule *Green* in light of *United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), where the Supreme Court held, in the context of the exclusionary provisions of the plea-statement rules, Fed.R.Evid. 410, Fed.R.Crim.P. 11(e)(6), that absent clear Congressional intent, courts should presume that statutory

provisions may be waived by voluntary agreement of parties. *Id.* at —— — ——, 115 S.Ct. at 801–02. Because we hold that the release is enforceable, we need not address Teledyne's alternative contention.

AFFIRMED.