**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

---

UNITED STATES *ex rel*. RUTH
RITCHIE,

        Plaintiff/Relator - Appellant,

v.

LOCKHEED MARTIN CORP. and
LOCKHEED MARTIN SPACE SYSTEMS
CO.,

        Defendants - Appellees,

_____

UNITED STATES OF AMERICA,

        Amicus Curiae.

Nos. 07-1295 & 08-1112

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-CV-1937-EWN-MJW)**

---

Victor A. Kubli, Grayson & Kubli, P.C., Vienna, VA (Alan M. Grayson and
Melissa A. Roover, Grayson & Kubli, P.C., McClean and Vienna, VA, on the
briefs), for Appellant.

Mark J. Meagher, McKenna Long & Aldridge LLP, Denver, CO (Sandra B. Wick
Mulvany, McKenna Long & Aldridge LLP, Denver, CO; and Jennette C. Roberts,
McKenna Long & Aldridge LLP, Los Angeles, CA, with him on the briefs), for
Appellees.

Henry C. Whitaker, Attorney, Appellate Staff, Department of Justice,
Washington, D.C. (Gregory G. Katsas, Assistant Attorney General, Washington,
D.C.; Troy A. Eid, United States Attorney, Denver, CO; Michael S. Raab,

Attorney, Appellate Staff, Department of Justice, Washington, D.C., with him on the briefs), for Amicus Curiae.

Before **BRISCOE**, **EBEL**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Relator-Appellant Ruth Ritchie filed these consolidated appeals following a grant of summary judgment in favor of Defendant-Appellee Lockheed Martin Corporation ("Lockheed").[1] Ritchie filed the instant qui tam action alleging, inter alia, fraud on the part of Lockheed in relation to its billing practices under certain federal contracts. The district court granted summary judgment on the basis of releases signed by Ritchie prior to the filing of the qui tam suit. Ritchie argues the releases are unenforceable because they were signed without the government's consent and because their enforcement would be contrary to the federal policies underlying the False Claims Act. Before Ritchie signed the releases, Lockheed disclosed the fraud allegations to the federal government, which conducted its own audit and investigation of the charges billed under the federal contract. Because the federal interests served by enforcing releases signed after disclosure

---

[1]The case caption lists the defendants as Lockheed Martin Corporation and Lockheed Martin Space Systems Company. The district court apparently recognized that these are not separate entities, since Lockheed Martin Space Systems Company is an unincorporated division of Lockheed Martin Corporation. Accordingly, we refer to the "defendants" in the singular as Lockheed.

to the federal government outweigh the interests served by not enforcing them, this court concludes the releases are enforceable. Ritchie also argues the district court erred in refusing to allow her to amend her complaint or substitute a relator and objects to the assessment of costs against her pursuant to Rule 54(d)(1). Reviewing both issues for abuse of discretion, we find no error by the district court. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, the judgment of the district court is **affirmed**.

## I. Background

Ritchie worked for Lockheed and its predecessor companies from 1979 until 2004. In 2002 she was assigned to oversee and validate the Mission Success Incentive Program ("MSI") and Critical Skills Incentive Program ("CSI") databases. These databases contained information about special pay incentives for certain employees working under expiring contracts with the U.S. Air Force. Ritchie began to raise concerns about fraud in connection with the Programs almost immediately after she began validating the databases. She believed Lockheed managers were falsifying records to increase incentive payments to Lockheed employees. The incentives would be paid by the U.S. Air Force, and thus, in Ritchie's view, the falsifications constituted fraud against the federal government.

*A. Investigations into Fraud*

Ritchie initially brought her concerns to the attention of various parties within Lockheed. In June of 2002, Ritchie contacted a Human Resources Business Manager to suggest a review of irregularities in the MSI database. Lockheed proceeded to conduct an internal audit of the MSI Program, and Ritchie participated in the audit. The auditors released a report in August of 2002 identifying inconsistencies and inaccuracies in the MSI program and outlining corrective procedures. In May of 2003, unconvinced the problems had been fixed, Ritchie contacted Lockheed's Corporate Ethics Officer to raise concerns about discrepancies in the databases and retaliation by her supervisors. This triggered more internal investigations regarding Lockheed's charging practices under the MSI and CSI programs. Several Lockheed employees investigated Ritchie's allegations with respect to the CSI program and retaliation by her supervisors ("the ethics investigation") and concluded the allegations were unsubstantiated. An internal auditor conducting a second audit found inaccuracies in the MSI database, but concluded they did not result in over-accrual of incentive payments and thus did not result in a negative fiscal impact to the government.

After Ritchie made her May 2003 complaint, Lockheed informed the Air Force that allegations had been made regarding payments under the incentive plans. When the ethics investigation and the second audit were complete,

Lockheed briefed the Air Force and the Defense Contract Management Agency[2] on the results of each audit and investigation conducted in response to Ritchie's complaints. The parties dispute the thoroughness of this briefing.

Shortly after the briefing, the Defense Contract Audit Agency ("DCAA"), a federal agency which audits defense contracts, commenced its own audit of the MSI database for fiscal year 2001. Ritchie assisted with this audit, communicating with the auditor at least five times and serving as the auditor's contact person at Lockheed. The DCAA auditor testified she was informed by Ritchie, in detail, of Ritchie's allegations regarding improper charging under both the MSI and CSI programs. Ritchie claims she informed DCAA of alterations in the relevant databases but did not provide the DCAA auditor with the substance of her fraud allegations. It is uncontroverted, however, that DCAA expanded the scope of its audit in response to information provided by Ritchie; informed Ritchie she could take her concerns directly to the Defense Criminal Investigative Service ("DCIS"), the criminal investigative wing of the Defense Department's Office of the Inspector General; and later made its own referral to DCIS. The final DCAA audit report was issued in February 2005.

---

[2]The Defense Contract Management Agency is an agency within the Department of Defense which oversees and administers defense contracts.

*B. Litigation History*

Believing she was the subject of retaliation because of her whistleblowing activities,[3] Ritchie sent a letter to Lockheed requesting $850,000 in damages. The parties participated in mediation and arrived at a settlement. The settlement contained a "General Release of Claims," which was defined as "a waiver and release of any and all claims [Ritchie] might have under federal, state, or local law." Under the settlement, Ritchie was placed on administrative leave for about four months and then terminated, at which time she received lay-off benefits. She also received $24,000, payable in two installments: one immediate payment of $19,000, and another payment of $5000 payable upon her termination so long as she agreed to sign a supplemental release. Upon her discharge she signed the supplemental release, which contained the same language as the first release, and received the $5000 payment.[4]

Ten days after signing the supplemental release, Ritchie filed the present qui tam action. Fifty of the 112 paragraphs in her complaint restated material

[3]Ritchie's allegations of retaliation were based upon negative job performance ratings, the denial of merit pay increases, and sabotage of work assignments.

[4]The settlement agreements also contained clauses, cited at pages 2-3 of the dissent, prohibiting Ritchie from voluntarily assisting other entities in bringing claims against Lockheed. Lockheed does not assert that these clauses preclude Ritchie from cooperating with the government in its efforts to bring its own FCA claim. This court therefore has no reason to decide whether such a prohibition would be enforceable in this case.

from the demand letter she had sent to Lockheed. Ritchie stated three causes of action under the False Claims Act ("FCA"): (1) knowingly presenting false claims for the purpose of obtaining payment in violation of 31 U.S.C. § 3729(a)(1); (2) knowingly using false records or statements to obtain payment of a false claim in violation of § 3729(a)(2); and (3) retaliation for reporting and attempting to correct false claims in violation of § 3730(h).

The case was referred by the district court to a magistrate judge for pretrial proceedings. The magistrate judge's scheduling order set February 3, 2006, as the final date for the amendment of pleadings and joinder of parties. The magistrate judge also set a discovery deadline of October 20, 2006, and a dispositive motion deadline of November 20, 2006. On November 20, 2006, Lockheed filed a motion for summary judgment, arguing the releases signed by Ritchie prevented her from bringing her claims. Prior to filing a response to the summary judgment motion, Ritchie filed a "Motion for Leave to Amend to Add a Co-Relator, or, in the Alternative, to Substitute Relators," seeking to add Blair Froistad, a former Lockheed auditor, as a relator. Ritchie attempted to explain this delay in adding Froistad to the case by arguing she had only just learned of Froistad's departure from Lockheed. The magistrate judge recommended rejecting the motion to amend. The district court accepted that recommendation and also granted summary judgment to Lockheed. Ritchie appeals these rulings.

-7-

After granting summary judgment, the district court awarded costs to Lockheed. Ritchie objected to the award of costs, arguing 31 U.S.C. § 3730(d)(4) precludes an award of costs in an FCA case unless the claim was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment. Ritchie also asked the district court to exercise its discretion to not award costs. The district court denied Ritchie's motion, and Ritchie appeals.

## II. Discussion

### A. *Motion to Amend*

The district court accepted the magistrate judge's recommendation to deny Ritchie's motion for leave to amend. This court reviews the decision of the district court to deny leave to amend for abuse of discretion. *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006).

The district court analyzed the motion to amend under both Rule 15(a)(2), which governs the amendment of pleadings prior to trial, and Rule 16(b)(4), which governs the amendment of pretrial scheduling orders. This court has not yet considered whether Rule 16(b)(4) must be met when motions to amend pleadings would necessitate a corresponding amendment of scheduling orders. *Minter*, 451 F.3d at 1205 n.4. Because the motion cannot meet the Rule 15(a)(2) standard, however, this court does not address whether compliance with Rule 16(b)(4) is also required. *Id.*

Once the time for amendment as a matter of course has passed, pleadings can be amended only by consent of the opposing party or leave of the court. Fed. R. Civ. P. 15(a)(2). Leave should be freely given "when justice so requires." *Id.* Motions to add or substitute parties are considered motions to amend and therefore must comply with Rule 15(a). *United States ex rel. Precision Co. v. Koch Indus.*, 31 F.3d 1015, 1018 (10th Cir. 1994). The Supreme Court has indicated district courts may withhold leave to amend only for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The motion for leave to amend was made after the close of a long discovery period and after Lockheed had filed a motion for summary judgment premised upon the releases signed by Ritchie. At a minimum, the proposed amendment would have required the reopening of discovery regarding Froistad's jurisdictional eligibility to be a relator.[5] Lockheed's time and effort in preparing the summary judgment motion would have been wasted, since the motion focused upon a defense personal to Ritchie. The additional expense of adjudicating

---

[5]For example, a relator cannot bring a suit based upon allegations already publicly disclosed unless the relator is an original source of the information. 31 U.S.C. § 3730(e)(4)(A).

Froistad's eligibility and the lost expense of preparing the summary judgment motion would have prejudiced Lockheed.

Ritchie argues she was justified in waiting to add Froistad as a relator because she only learned of his departure from Lockheed approximately one month before the motion for leave to amend was filed. She argues her counsel could not have contacted Froistad before that point because he was represented by Lockheed's counsel.

Even assuming Ritchie could not contact Froistad while he was an employee of Lockheed, Froistad already knew of the allegations of fraud from discussions with Ritchie that occurred in 2002 and 2003. Froistad therefore could have filed his own suit at that time if he believed he had a valid claim. His status as a Lockheed employee would not have prevented this, since the FCA's anti-retaliation provision, § 3730(h), protects employees who file qui tam actions. Froistad chose not to file his own suit, and instead tried to join Ritchie's suit after discovery was closed and a summary judgment motion had been filed against her.

Froistad's delay in joining the suit despite his earlier knowledge of the fraud allegations would have unduly prejudiced Lockheed because it would have necessitated the re-opening of discovery and rendered worthless the time and effort Lockheed expended on its motion for summary judgment. *Cf. Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250-51 (10th Cir. 2001) (holding motion for intervention timely under Rule 24(a)(2) of the Federal Rules of Civil

-10-

Procedure because case was far from final disposition, no scheduling order had been issued, no trial date set, and no cut-off date for motions set). Because the substantial delay in seeking to add Froistad as a relator would have unduly prejudiced Lockheed, the district court did not abuse its discretion in denying leave to amend.

*B. Enforceability of Releases*

The district court granted summary judgment to Lockheed by enforcing the releases she signed after the mediation. This court reviews a grant of summary judgment de novo, applying the same standard applied by the district court. *King v. PA Consulting Group, Inc.*, 485 F.3d 577, 585 (10th Cir. 2007). Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The legal conclusions relied upon by the district court are reviewed de novo. *Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund*, 410 F.3d 1194, 1198 (10th Cir. 2005).

As a threshold matter, this court must determine whether the language in the releases is broad enough to encompass qui tam claims. The releases purport to cover "any and all claims [Ritchie] might have arising under federal, state or local law." Ritchie argues the FCA claims are not claims she "might have" because they belong to the United States. This argument is undercut by the language of the FCA and by Supreme Court precedent. The FCA states relators

"may bring a civil action for a violation of [the FCA] *for the person* and for the United States Government." 31 U.S.C. § 3730(b) (emphasis added). Thus the relator has an interest in some part of the civil action apart from the government. The Supreme Court verified this when it stated that qui tam relators under the FCA possess an interest akin to a "partial assignment of the Government's damages claim." *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000). The portion of the claim assigned to the relator, namely the amount the relator is entitled to recover in a successful action, belongs to the relator to a sufficient degree that it should be considered under the releases signed in this case as a claim Ritchie "might have under federal . . . law."

Ritchie attacks the district court's ruling on two other grounds. First, she argues the FCA requires consent by the Attorney General prior to the settlement of qui tam claims, and in the absence of such consent the releases are unenforceable. Second, she argues the enforcement of the releases under the circumstances of this case would frustrate the policies behind the FCA.

### 1. Attorney General Consent

Ritchie points to 31 U.S.C. § 3730(b)(1), which states: "A person may bring a civil action . . . for the person and for the United States Government. . . . The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." She argues this statute requires the consent of the Attorney General to any settlement of a qui

tam suit, including a settlement preceding the actual filing of the qui tam action. In support, Ritchie cites to cases from the Fifth and Sixth Circuits interpreting § 3730(b)(1) as requiring government consent to the voluntary dismissal of qui tam actions at any point after they have been filed. *See United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000); *Searcy v. Philips Electronics of N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997).

The statute itself only mentions the "dismissal" of a qui tam action and further requires the consent of the court. When there is a release preceding the filing of the qui tam action, as in this case, no action has been filed, so there is neither an action to dismiss nor a judge to consent to the agreement. As a consequence, the statute only governs the enforceability of settlement agreements made after the filing of a qui tam claim. *See United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 960 (9th Cir. 1995). The statute is of no assistance to Ritchie in this case because she signed her releases before filing the qui tam case.

2. Does federal policy preclude the enforcement of these releases?

Ritchie contends the court should decline enforcement of her release on policy grounds even if the FCA does not bar enforcement. Her release is a contract and its enforceability is ordinarily a question of state law. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000). Federal common law may supplant state law, however, when "a significant conflict exists between [a]

-13-

federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507 (1988) (citations, quotation, alteration omitted).

The goal of the FCA is to prevent and rectify fraud perpetrated by government contractors. *Green*, 59 F.3d at 963. The qui tam provisions of the FCA provide an incentive to private individuals to uncover and prosecute FCA claims by giving them a portion of the amount recovered for the United States. *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994). Private individuals are enlisted in this effort because they have information about fraud that may be unavailable to the government and because the government lacks the resources to prosecute every fraud claim it may have. *Green*, 59 F.3d at 963.

Settlements of qui tam claims directly implicate this federal interest in combating fraud. When an individual prevails in a qui tam lawsuit, she is only entitled to a percentage of the amount recovered on behalf of the government. *Id.* at 965. If the individual signs a general release in exchange for money, however, she will probably keep the entire amount.[6] *Id.* at 965-66. The contractor and the

---

[6]As the *Green* court recognized, the government may have a case in unjust enrichment against would-be relators who settle qui tam claims and keep all of the settlement proceeds. *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 966 n.10 (9th Cir. 1995). That question is not before this court, but it

(continued...)

would-be relator might settle a qui tam case for less than the amount recoverable on behalf of the government but more than the prospective relator's share of the recovery had a qui tam action been filed. *Id.* at 966. Thus, there is a federal interest in protecting the federal government's right to recover under the FCA.

The protection of this interest, in turn, should not vary from state to state based upon variations in state contract law. *Id.* at 961. Additionally, state-by-state variations might allow parties to use choice-of-law clauses to select "as governing law the law of a state that is most likely to uphold the release." *Id.* Under these circumstances, a uniform federal rule is appropriate to protect the federal interest at stake. *Id.* Therefore, this court shall apply federal common law to determine the enforceability of the releases.

In determining the federal common law standard to be applied, both parties and the United States as amicus curiae rely upon Ninth Circuit precedent. *Green*, 59 F.3d 953; *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230 (9th Cir. 1997). In *Green*, an employee brought a lawsuit against a government contractor for state-law causes of action stemming from termination of his employment. 59 F.3d at 956. In settling those claims, the employee signed a general release. *Id.* The government had not yet been apprised of wrongdoing at the company. *See id.* at 966. Green later brought a qui tam action. Applying

_____

[6](...continued)
illustrates the divergence of interests between the government and individual relators.

federal common law, the Ninth Circuit adopted a balancing test to determine the enforceability of the releases, analyzing whether the interest in "'enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.'" *Id.* at 962 (quoting *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987)). The court allowed the qui tam action to proceed because the significant public interest in deterrence and restitution of fraud against the government outweighed the interest of encouraging the settlement of litigation. *Id.* at 963-69. In so doing, the court deemed it critical that the government did not learn of the fraud allegations until the filing of the qui tam action. *Id.* at 966.

In *Hall*, an employee of a company manufacturing nuclear reactor rod components notified the Nuclear Regulatory Commission of alleged defects in the construction of the components. 104 F.3d at 231. The NRC investigated the allegations and subsequently decided they were baseless. *Id.* at 231-32. After the employee complained to the NRC, he was suspended from work and ultimately fired. *Id.* at 232. Following his termination he brought state law claims against the company in state court. *Id.* That action settled and he signed a general release of claims. *Id.* Some ten months later the employee filed a qui tam action naming the same defendants and making the same allegations of fraud as he had in the state proceedings. *Id.* Distinguishing *Green*, the court enforced the release to bar the qui tam action. *Id.* at 233. Because the government already had full knowledge of the allegations as a result of the NRC complaint, the interest in

-16-

bringing information forward was absent. *Id.* Further, because the allegations were deemed baseless by the government, the interest in supplementing federal enforcement of FCA claims was not implicated. *Id.* The court concluded that no federal policies overrode the general policy in favor of encouraging settlement, and thus enforced the release. *Id.*

We adopt the Ninth Circuit's framework for analyzing releases of FCA claims as a workable method for protecting the federal interests at stake. To determine the enforceability of Ritchie's releases, we must analyze whether the interest in enforcement outweighs a public policy that would be harmed by enforcement.

In *Green* and *Hall*, the Ninth Circuit focused heavily upon the federal interest in the disclosure of fraud. In *Green*, the government had no knowledge of the fraud prior to the filing of the qui tam suit, while in *Hall* the government had already been apprised of the allegations due to prior disclosures to a federal agency. Not surprisingly, Ritchie likens the facts of this case to *Green*, while both Lockheed and the United States as amicus curiae argue this case is closer to *Hall*.

Ritchie contends the government lacked full knowledge of the scope of the fraud at the time she signed the release, and thus its enforcement would fail to protect the federal policy favoring the disclosure of fraud. Although Lockheed voluntarily disclosed to the federal government Ritchie's allegations of fraud, she

characterizes those disclosures as a "whitewash" because Lockheed also informed the government it believed the allegations lacked merit. Ritchie also argues the government's audit of the databases in question was incomplete, as it only covered database entries for one year. Thus, she asserts, it could not have provided the government with a full picture of the fraud.

The disclosures to the government in this case were sufficient to satisfy the public interest in uncovering fraud. Even if Ritchie is correct in characterizing Lockheed's disclosures to the government as a "whitewash,"[7] the government subsequently conducted its own inquiry into the matter. Although the parties dispute the amount of information Ritchie provided to the DCAA auditor, it is undisputed that the scope of the audit expanded in response to Ritchie's disclosures and her allegations were taken seriously enough to warrant referral to criminal investigators. Under these circumstances, the federal government had ample opportunity to uncover and prosecute any fraud that had taken place.[8]

Enforcing releases of qui tam claims only when the allegations of fraud have been disclosed to the government before the release also has the benefit of encouraging voluntary disclosure by government contractors. Although Lockheed

---

[7]The contractor in *Hall* also disclosed the relator's allegations to the government and similarly took the position that the allegations were unfounded. *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 231 (9th Cir. 1997).

[8]Since the government owns the FCA action, it is still free to bring its own suit after a would-be relator settles his or her own claim. 59 F.3d at 967.

-18-

believed Ritchie's allegations were baseless, it still relayed them to the government. Important to our analysis, Lockheed gave the DCAA auditor full access to Ritchie, even making her the auditor's point of contact. These steps enabled the government to conduct its own inquiry into the alleged fraud. Contractors like Lockheed have an interest in settling qui tam claims prior to the filing of a lawsuit. If they can settle qui tam claims only after fraud allegations have been disclosed to the government, then contractors effectively have an incentive to disclose. On policy grounds, then, conditioning the enforceability of releases of qui tam claims upon the prior disclosure of the fraud allegations to the government promotes the federal interest in uncovering fraud against the government. Additionally, allowing for settlement of qui tam claims in these circumstances furthers the general federal interest in encouraging settlement. *Hall*, 104 F.3d at 233.

The *Hall* court identified one factor favoring settlement in that case which is not present here. Namely, in *Hall*, the federal government had already concluded the allegations lacked merit at the time the employee entered into his settlement with the company. *Id.* Therefore, the court reasoned, the public interest in supplementing federal enforcement of the FCA was not applicable, since there is no public interest in supplementing the enforcement of meritless claims. *Id.* Here, the federal government had not issued its final audit report when the settlement was reached or the qui tam suit was filed, so the interest in

supplementing federal enforcement is still present.[9]  On balance, however, that interest does not outweigh the federal interests served by enforcement of settlements following disclosure of fraud allegations to the government, namely the interest in disclosure of fraud allegations and the interest in encouraging settlement.  The releases in this case are therefore enforceable,[10] and the district court properly granted summary judgment for Lockheed.

## C. Costs

Ritchie argues the district court's award of costs to Lockheed pursuant to Rule 54(d) was contrary to the FCA, and in the alternative, the district court

---

[9]The dissent would require an additional safeguard to protect the government's interest in supplementing enforcement: it would refuse to enforce any pre-filing release unless it had the Attorney General's consent.  Dissenting Op. at 5-6.  Such an approach, however, could well undercut the incentive for government contractors to voluntarily disclose allegations of fraud because they would have no guarantee that such disclosure would render pre-filing releases enforceable.  Under the dissent's approach, the Attorney General would be under no obligation to approve the pre-filing release, and consent could be withheld even if allegations of fraud have been fully disclosed.  If the incentive to disclose fraud allegations is diminished, there is the risk that fewer fraud cases will see the light of day.  It is also illuminating that, as amicus, the government has not advanced the dissent's approach but has instead asked this court to adopt *Hall*'s reasoning.

[10]Since the releases are enforceable and bar all of Ritchie's claims, we do not reach the issue, also left open in *Green*, of whether releases are ever unenforceable with respect to FCA retaliation claims.  *Green*, 59 F.3d at 968 n.12.

should have refused to award costs because such awards are a disincentive to potential relators.[11]

Awards of costs are reviewed for an abuse of discretion. *Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1190 (10th Cir. 2004). An abuse of discretion occurs, inter alia, when a district court makes an error of law. *United States v. Yarbrough*, 527 F.3d 1092, 1101 (10th Cir. 2008). Unless a statute provides otherwise, costs should ordinarily be awarded to prevailing parties. Fed. R. Civ. P. 54(d)(1).

Ritchie first argues 31 U.S.C. § 3730(d)(4) governs the award of costs in FCA cases. The statute provides: "The court may award . . . reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4). Although the statute does not mention "costs," Ritchie argues "costs" are a subset of "expenses" and are therefore covered by the statute. If costs are covered by the statute, she argues, the district court could not have awarded them without determining her claim to be "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." *Id.*

---

[11]Ritchie filed her appeal of the district court's final judgment prior to the clerk's assessment of Lockheed's costs. She then filed a subsequent appeal of the award of costs. Those appeals have been consolidated for procedural purposes.

Both the FCA and Rule 54 disprove Ritchie's theory. Elsewhere in the FCA, the statute explicitly mentions "costs" as a category separate from attorneys' fees and expenses. *See* 31 U.S.C. § 3730(d)(2) (allowing for the recovery of attorneys' fees, expenses, and costs for prevailing relators). Rule 54 also makes a distinction between attorneys' fees and expenses, which are only recoverable upon a motion specifying the legal grounds entitling the movant to the award, and costs, which are awarded as a matter of course. *Compare* Fed. R. Civ. P. 54(d)(2)(B)(ii), *with* Fed. R. Civ. P. 54(d)(1). Section 3730(d)(4) does not govern the recovery of costs by a prevailing defendant, and the district court properly applied the Rule 54(d)(1) standard.

Ritchie next argues the district court should have exercised its discretion to refuse an award of costs under Rule 54(d)(1). According to Ritchie, relators are forced to expend their own resources enforcing the rights of the government, and the policy underlying the FCA is to encourage qui tam suits. Forcing relators to cover the costs of prevailing defendants would be a disincentive to potential relators.

The district court did not abuse its discretion in rejecting Ritchie's generalized, policy-based rationale for why Lockheed should not be awarded costs. If this court were to hold otherwise, it would effectively legislate a per se rule preventing prevailing FCA defendants from recovering costs, since Ritchie's policy-based argument would be equally applicable in every FCA case.

-22-

*D. Discovery Issues*

During discovery, Ritchie filed an untimely motion to compel, and Lockheed sought a sanction in the amount of the fees incurred in responding to the motion. Ritchie objected to the amount of money sought by Lockheed, and the district court awarded a smaller sanction than what Lockheed sought. For the first time on appeal, Ritchie argues the sanction was contrary to the intent of the FCA because discovery sanctions could deter relators from bringing qui tam suits. This FCA preclusion argument was not presented below, and we decline to hear it for the first time on appeal. *See Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1221 (10th Cir. 2005).

Ritchie also appeals the partial denial of her second motion to compel, arguing Lockheed wrongfully withheld discoverable evidence. Because we affirm the district court's grant of summary judgment solely on the basis of the releases signed by Ritchie, we do not reach this issue.

### III. Conclusion

For the foregoing reasons, the decisions of the district court granting summary judgment and awarding costs to Lockheed are hereby **affirmed.**[12]

---

[12] Lockheed filed its brief accompanied by a motion to file the brief under seal. The motion was provisionally granted with the ultimate determination to be made by the merits panel. This court then issued an order to show cause requesting additional information to decide the motion. In its response to the order, Lockheed indicated it was withdrawing the motion. Therefore, the provisional order sealing appellees' brief is **vacated**, and the brief is ordered unsealed.

07-1295 & 08-1112, United States ex rel. Ritchie v. Lockheed Martin

**BRISCOE,** Circuit Judge, concurring and dissenting:


I join Parts I, II(A), II(B)(1), and II(D) of the majority's opinion, concur in the opening section of Part II(B), concur in part and dissent in part from Part II(B)(2), and dissent from Part II(C).

### *Enforceability of releases*

In the opening section of Part II(B) of its opinion, the majority concludes that "the language in the releases" referring to "'any and all claims [Ritchie] might have arising under federal, state or local law,'" is broad enough to preclude her from filing this qui tam action. Maj. Op. at 11. More specifically, the majority concludes, citing both the language of the FCA and Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 773 (2000), that "[t]he portion of the claim assigned to the relator, namely the amount the relator is entitled to recover in a successful action, belongs to the relator to a sufficient degree that it should be considered under the releases signed in this case as a claim Ritchie 'might have under federal . . . law.'" Maj. Op. at 12.

I respectfully disagree with this conclusion. To be sure, the Supreme Court concluded in Vermont Agency, in the context of analyzing a qui tam relator's standing to maintain a suit under the FCA, that "[t]he FCA can reasonably be regarded as effecting a partial assignment" from the government to the qui tam relator. 529 U.S. at 773. Importantly, however, the Court emphasized that this

partial assignment was only "of the Government's <u>damages claim</u>." <u>Id.</u> (emphasis added). Moreover, the Court noted that "[a] *qui tam* relator has suffered no . . . invasion" of a "legally protected right," <u>id.</u> at 772-773, and emphasized that "the 'right' he seeks to vindicate does not even fully materialize until the litigation is completed and the relator prevails," <u>id.</u> at 773. Further, the Court characterized "the relator's suit" as one simply for "bounty," <u>id.</u>, and distinguished between "a bounty and an express cause of action," <u>id.</u> at 777.

Interpreting the Court's language in <u>Vermont Agency</u>, the Second Circuit recently concluded, and I agree, that "while the False Claims Act permits relators to control the False Claims Act litigation, the claim itself belongs to the United States." <u>United States ex rel. Mergent Serv. v. Flaherty</u>, 540 F.3d 89, 93 (2d Cir. 2008) (citing <u>Vermont Agency of Natural Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 774-75 (2000)). Applying that principle to the facts presented here, the FCA claims ultimately asserted by Ritchie belonged to the United States, not Ritchie. Thus, it is far from certain in my view that the release language quoted by the majority encompassed those FCA claims.

Having said this, I note that Paragraph 11 of each release provided:

Employee understands that if this Agreement were not signed, Employee would have the right to voluntarily assist other individuals or entities in bringing claims against Employer. Employee hereby waives that right and will not provide any such assistance other than assistance in an investigation or proceeding conducted by the United States Equal Employment Opportunity Commission. Employee and Employer further agree that Employee may provide information

pursuant to any valid subpoena, provided that Employee first notifies Employer in writing of the proposed disclosure in order to provide Employer an opportunity to seek a Protective Order.

In my view, this language was sufficiently broad to have encompassed Ritchie's right to serve as a relator in a qui tam action.

### *Does federal policy preclude the enforcement of these releases?*

I agree with the majority's conclusions, in Part II(B)(2), that "there is a federal interest in protecting the federal government's right to recover under the FCA," Maj. Op. at 15, that "a uniform federal rule is appropriate to protect the federal interest at stake," id. at 16, and that, accordingly, we must "apply federal common law to determine the enforceability of the releases," id.  As to the federal common law standard to be applied in this case, I also agree with the majority that the Ninth Circuit's analysis in United States ex rel. Green v. Northrop Corp., 59 F.3d 953 (9th Cir. 1995), is thorough and well-reasoned and that we should adopt it as our own.

I disagree with the majority's decision, however, to adopt the Ninth Circuit's analysis in United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230 (9th Cir. 1997).  Several related public interests are undoubtedly at stake under the FCA's enforcement scheme.  These include (1) incentivizing insiders to come forward with information about fraud against the Government, (2) supplementing Government efforts to recoup monies lost due to fraud, and (3) deterring fraud against the Government.  See, e.g., False Claims Amendment Act

of 1986, S. Rep. No. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272 ("In addition to detection, investigative and litigative problems which permit fraud to go unaddressed, perhaps the most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies."); id. at 8 ("[a]n additional problem . . . exists when large, profitable corporations are the subject of a fraud investigation and able to devote many times the manpower and resources available to the Government."); id. ("The Committee believes that the amendments . . . which allow and encourage assistance from the private citizenry can make a significant impact on bolstering the Government's fraud enforcement effort."); id. at 23-24 (amending the FCA's qui tam provision in order "to encourage more private enforcement suits"). The Ninth Circuit's analysis in Hall focuses primarily on the first interest: providing insiders with incentives to come forward with information about fraud against the Government. See Hall, 104 F.3d at 233. Most of the cases applying the Green/Hall framework have likewise focused on these incentives. See, e.g., United States ex rel. Longhi v. Lithium Power Tech., Inc., 481 F. Supp. 2d 815, 818-21 (S.D. Tex. 2007).

The problem with the Hall exception is that it undermines one of the other public interests under the FCA: the Government's compensatory interest in recouping funds lost due to fraud. Presumably, the Government has two potential reasons for declining to pursue a civil fraud claim independently when it knows

of the allegations: (1) the suit lacks merit, or (2) the Government lacks the

resources to be an active party to the litigation.  The FCA is designed to help

remedy the latter scenario:

> [P]erhaps the most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies. Unlike most other types of crimes or abuses, fraud against the Federal Government can be policed by only one body—the Federal Government.  State and local law enforcement are normally without jurisdiction where Federal funds are involved.
>
> Taking into consideration the vast amounts of Federal dollars devoted to various complex and highly regulated assistance and procurement programs, Federal auditors, investigators, and attorneys are forced to make 'screening' decisions based on resource factors. Allegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient.  And with current budgetary constraints, it is unlikely that the Government's corps of individuals assigned to anti-fraud enforcement will substantially increase.

S. Rep. No. 99-345, at 7; see also Ridenour v. Kaiser-Hill Co., L.L.C., 397 F.3d

925, 931 n.9 (10th Cir. 2005) ("The increased incentives to private individuals

have proven effective at helping the Government recover substantial sums of

fraudulently obtained payments."); Green, 59 F.3d at 968 ("The relator's right to

recovery exists solely as a mechanism for deterring fraud and returning funds to

the federal treasury."); cf. United States v. Health Possibilities, 207 F.3d 335, 343

n.6 (6th Cir. 2000) ("There is absolutely no statutory authority for the proposition

that simply because the government decides not to expend the resources to

proceed with an action itself, it thereby authorizes the relator to settle the

government's claims in whatever manner he wishes.  Indeed, such a construction would only force the government to unnecessarily intervene in *qui tam* cases and thereby frustrate the efficacy of the *qui tam* framework." (citations omitted)); United States ex rel. DeCarlo v. Kiewit/AFC Enter., Inc., 937 F. Supp. 1039, 1047 (S.D.N.Y. 1996) ("[T]he government's decision not to participate in the *qui tam* action is not equivalent to a consent to voluntarily dismiss a claim against a defendant with prejudice.  Non-intervention does not necessarily signal governmental disinterest in an action, as it is entitled to most of the proceeds even if it opts not to intervene.").  By allowing contractors to buy off relators whose resources would otherwise be available to pursue fraud claims on behalf of the Government, the exception from Hall disregards the Government's compensatory interest in recouping funds lost due to fraud.

As I see it, a better rule would be that prefiling releases are unenforceable under the FCA unless the Government—and more specifically, the Attorney General—has provided its express written consent.[1]  An express consent rule is consistent with the FCA's post-filing settlement requirements.  See 31 U.S.C. § 3730(b)(1); Ridenour, 397 F.3d at 931 n.8.  Such a rule also accounts for the

---

[1] The Green court actually hinted at a consent requirement as a potential prerequisite for enforcing a prefiling release.  Cf. Green, 59 F.3d at 965 ("[P]ermitting a prefiling release when the government has neither been informed of, *nor consented to*, the release would . . . frustrate one of the central objectives of the Act." (emphasis added)).  Green did not explicitly require such consent, though, and the Hall court chose to import a broader exception.

Government's compensatory interest in recouping funds lost due to fraud. If the Government wants the relator to have the opportunity to bring suit on the Government's behalf to recoup the lost funds, then the Government can simply withhold its consent.

An express consent rule also decreases the risk that the relator and contractor will bargain away the Government's claim. See Health Possibilities, 207 F.3d at 340-41 (concluding that "the power to veto a privately negotiated settlement of public claims is a critical aspect of the government's ability to protect the public interest in *qui tam* litigation," and that without such power "the public interest would be largely beholden to the private relator"); Searcy v. Philips Elec. N. Am. Corp., 117 F.3d 154, 160 (5th Cir. 1997) (noting that the express consent provision of § 3730(b)(1) allows the government to reduce the risk that "relators [will] manipulate settlements in ways that unfairly enrich them and reduce benefits to the government"); Green, 59 F.3d at 966 (noting that "a rational relator" has a financial incentive "to accept a substantially smaller amount to settle the claim immediately than to preserve the right to eventually file a qui tam action in which the government would retain the lion's share of the proceeds"). Admittedly, even the Hall exception provides some protection from parties bargaining away the Government's claims, because the Government must know about a claim for Hall to apply—and the Government can always bring the claim later, if it so desires. See Hall, 104 F.3d at 233. Nevertheless, there is still

a risk under Hall that the Government will not bring a meritorious claim simply because the Government lacks the resources to do so. The parties will likely know this, and the contractor will pay the relator more money to reflect the probability that resource constraints will preclude the Government from bringing the claim independently. An express consent rule helps prevent this problem by allowing the Government to veto the release of relators who would otherwise pursue meritorious FCA claims with their own resources.

Moreover, if we require the Government's express consent, then contractors will be forced to disclose enough information to satisfy the Government. This will help the Government investigate the alleged fraud, and it will ensure that the Government is satisfied with its investigation before a relator can be released. Along these same lines, an express consent rule eliminates a very difficult task for the courts: attempting to determine, based on the conflicting evidence and testimony of two adverse parties (the contractor and the relator), whether a third party (the Government) is satisfied with its knowledge and investigation of the alleged fraud. In the case before us, as in any case which involves a representation that a party will "tell all," it is very difficult to determine whether all relevant information was in fact disclosed by Lockheed and whether, as a consequence, the extent of the alleged fraud was fully investigated by the Government. From my distant vantage point in this case, the exchange of information and the extent of the Government's investigation appears superficial.

-8-

I fully recognize that requiring express consent will likely deter more settlements than under the Hall framework. If the Government withholds its express consent, then the parties will have to value the settlement to include the probability of the relator filing a subsequent *qui tam* action. If that probability is high, then the value of settling, from the contractor's perspective, will be correspondingly low. This may well result in fewer settlements, which will impinge on the parties' interest in resolving disputes. As the Ninth Circuit has pointed out, though, the settlements at most risk of falling apart in this context are those in which the contractor is most likely to have committed fraud. Green, 59 F.3d at 969. This, in my view, is not necessarily a bad result.

I also recognize, relatedly, that an express consent requirement may make it more difficult for parties to craft an agreeable prefiling release. Most likely, the Government will not be bound by the prefiling release between the relator and the contractor, so the Government will still be able to bring its own claim for the alleged fraud. See Hall, 104 F.3d at 233 ("The government, of course, was not a party to the release, and is therefore not barred by it from pursuing a claim against Teledyne."). This is one way in which prefiling consent will differ from post-filing consent: in the post-filing settlement context, the FCA claim is usually dismissed with prejudice, and the Government is barred from pursuing it further. The contractor has several potential solutions to this problem, however. Most obviously, the contractor can attempt to include the Government in the prefiling

settlement and release. This will actually further the FCA's purpose, because the Government will only agree to be a party to the release if it has adequately investigated the alleged fraud and if the settlement provides the Government with adequate compensation. Also, in situations where the Government has provided its express consent but is not a party to the release, the contractor can discount the value of the settlement by the risk that the Government will bring its own claim for the same fraud. In short, an express consent rule protects and furthers the interests at stake under the FCA, while at the same time providing the parties with some flexibility to account for the circumstances of each individual case.

Because I favor adoption of an express consent rule, I must in turn conclude, since the Government never consented to Ritchie's release, that we must reverse the district court's grant of summary judgment in favor of Lockheed. That is, I would conclude that the release does not bar Ritchie's subsequent *qui tam* action under the FCA.

### *Costs*

Because I would reverse the district court's grant of summary judgment in favor of Lockheed, I would also, necessarily, reverse the district court's award of costs to Lockheed pursuant to Rule 54(d).