**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, STATE
OF DELAWARE, COMMONWEALTH OF
VIRGINIA, STATE OF CALIFORNIA,
STATE OF HAWAII, STATE OF
NEVADA, STATE OF TENNESSEE,
STATE OF ILLINOIS, STATE OF NEW
HAMPSHIRE, DISTRICT OF COLUMBIA,
STATE OF FLORIDA, STATE OF
MASSACHUSETTS, STATE OF TEXAS,
STATE OF LOUISIANA ex rel. MARK
RADCLIFFE,

No. 09-1202

     *Plaintiff-Appellant,*

v.

PURDUE PHARMA L.P.; PURDUE
PHARMA, INCORPORATED,

     *Defendants-Appellees.*

---

UNITED STATES OF AMERICA,

     *Amicus Curiae.*

UNITED STATES OF AMERICA, STATE
OF DELAWARE, COMMONWEALTH OF
VIRGINIA, STATE OF CALIFORNIA,
STATE OF HAWAII, STATE OF
NEVADA, STATE OF TENNESSEE,
STATE OF ILLINOIS, STATE OF NEW
HAMPSHIRE, DISTRICT OF COLUMBIA,
STATE OF FLORIDA, STATE OF
MASSACHUSETTS, STATE OF TEXAS,
STATE OF LOUISIANA ex rel. MARK
RADCLIFFE,                                      No. 09-1244
              *Plaintiff-Appellee,*

                    v.

PURDUE PHARMA L.P.; PURDUE
PHARMA, INCORPORATED,
              *Defendants-Appellants.*

UNITED STATES OF AMERICA,

              *Amicus Curiae.*

Appeals from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, Chief District Judge.
(1:05-cv-00089-jpj-pms)

Argued: January 27, 2010

Decided: March 24, 2010

Before TRAXLER, Chief Judge, AGEE, Circuit Judge,
and Catherine C. BLAKE, United States District Judge
for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Blake joined.

## COUNSEL

**ARGUED**: Mark Tucker Hurt, Abingdon, Virginia, for Appellant/Cross-Appellee. Jennifer O'Connor, WILMER-HALE, Washington, D.C., for Appellees/Cross-Appellants. Henry Charles Whitaker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Paul Wakefield Roop, II, ROOP LAW OFFICE, LC, Beckley, West Virginia, for Appellant/Cross-Appellee. Howard M. Shapiro, Kimberly A. Parker, Christopher E. Babbitt, Robert A. Mays, WILMERHALE, Washington, D.C., for Appellees/Cross-Appellants. Tony West, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Michael S. Raab, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

## OPINION

AGEE, Circuit Judge:

The plaintiff-relator, Mark Radcliffe ("Radcliffe"), filed a *qui tam* suit in the United States District Court for the Western District of Virginia alleging that his former employer, Purdue Pharma, L.P. ("Purdue"), defrauded the government by marketing its pain-relief drug, OxyContin, as a cheaper alternative to the drug it replaced, MS Contin, which was also manufactured by Purdue. Radcliffe alleged that Purdue, through its sales agents and marketing materials, falsely claimed to physicians that OxyContin was less expensive than its predecessor, MS Contin, because the "2:1 equianalgesic ratio between OxyContin and MS Contin . . . ma[de] Oxy-

Contin twice as potent and, as a result, cheaper per dose than MS Contin." J.A. 438. Radcliffe's suit alleged violations of the federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), as well as violations under various analogous state statutes.[1]

While the complaint was under seal pursuant to the procedures outlined in the FCA, Radcliffe filed three separate amended complaints before serving the Third Amended Complaint on Purdue. Purdue then moved to dismiss on three grounds: (1) bar and release, (2) the public disclosure bar, and (3) the failure to satisfy Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with particularity. The district court allowed limited discovery on the bar and release issue but subsequently ruled that a release Radcliffe gave Purdue was ineffective as a ground upon which to grant Purdue's motion to dismiss. The district court did, however, grant the motion to dismiss based on Radcliffe's failure to satisfy the pleading requirements of Rule 9(b). Radcliffe was given 30 days to amend his Complaint and he timely filed

---

[1]Congress enacted the [FCA] "during the Civil War in response to overcharges and other abuses by defense contractors, . . . [with the expectation that it] would help the government uncover fraud and abuse by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 582 F.3d 292, 298 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). "The FCA imposes civil liability (including treble damages and a fine of up to $10,000) on persons who knowingly submit false claims to the government for payment or conspire to use false claims to obtain payment from the government." *Id.* at 298-99 (citing 31 U.S.C.A. § 3729 (West 2003 & Supp. 2007)).

Private persons, known as "relators", may file FCA suits on the government's behalf. *Id.* at 299; *see* 31 U.S.C. § 3730. Such suits are referred to as "*qui tam*" actions. *Id.*; *see Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n. 1 (2000) ("*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'").

a Fourth Amended Complaint. Purdue again moved to dismiss and the district court again granted the motion for failure to satisfy the strict pleading requirements of Rule 9(b). The district court also dismissed the state law claims for failing to plead fraud with particularity and denied Radcliffe leave to file a Fifth Amended Complaint.

Radcliffe now appeals the district court's grant of the motion to dismiss and the denial of leave to amend. Purdue cross-appeals, asserting that the district court erred in refusing to enforce the "Agreement and General Release" Radcliffe signed on August 1, 2005 ("the Release"), prior to filing the *qui tam* suit. For the reasons that follow, we agree with Purdue that the district court erred in refusing to enforce the Release.[2]

## I. Background and Proceedings Below

### A. Radcliffe's Communications with Purdue and the Government

The district court determined that between 1996 and 2005 Radcliffe, on behalf of Purdue, marketed "OxyContin to individual physicians and became familiar with Purdue's marketing claims about OxyContin's relative cost and potency, including the claim that there is a 2:1 equianalgesic ratio between OxyContin and MS Contin." *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 774 (W.D. Va. 2008). During this period, Radcliffe was employed by Purdue as a district sales manager, directly marketing Purdue products like OxyContin to physicians. The district court found that some physicians were skeptical of the claimed 2:1 ratio, but Radcliffe's supervisor reassured Radcliffe that it was correct. *Id.* Despite these assurances, Radcliffe sought

---

[2]Because the Release is a complete bar to Radcliffe's claims, there is no need to address Radcliffe's arguments on the Rule 9(b) dismissal nor the district court's denial of leave to amend.

independent legal advice in 2004 about the OxyContin claims. *Id.*

In January 2005, using the alias "John Femaledeer," Radcliffe sent an email to a Purdue director and to Purdue's General Counsel offering to settle a "'whistleblower' suit against Purdue for fraud based on 'deceptive pharmacology'". In a subsequent email "John Femaledeer" (Radcliffe) sought to "settle" his *qui tam* claims with Purdue if the company would invest $40 million in his business startup project. Purdue rejected the offer.

Around that same time Radcliffe anonymously contacted an Assistant United States Attorney for the Western District of Virginia to determine whether there was any interest in a claim against Purdue, but did not reveal the particulars of his claims during those discussions. *Radcliffe*, 582 F. Supp. 2d at 774. The district court determined it was "undisputed that Radcliffe did not disclose the nature of his qui tam allegations to the government prior to the filing of his Complaint" on September 27, 2005. *Id.* at 775.[3]

B.   The Government's Investigation of Purdue

The government had been investigating Purdue prior to the filing of Radcliffe's suit. According to a declaration executed by an Assistant United States Attorney, "one area of investigation concern[ed] whether Purdue falsely marketed OxyContin as being twice as potent as morphine and, accordingly, less

---

[3]Radcliffe's theory of liability under the FCA is that Purdue defrauded the government by misleading physicians about the potency and cost-savings of OxyContin. Purdue's alleged fraudulent marketing, in turn, caused physicians to prescribe OxyContin to patients when MS Contin would have sufficed. Because MS Contin was actually cheaper, Radcliffe asserts that each time Medicare, Medicaid or another government program (Veterans' benefits for example) paid for a prescription of the higher priced OxyContin induced by Purdue's fraudulent marketing, the government paid a "false claim" subject to the FCA.

expensive than MSContin." *Id.* at 775. In the same declaration, the Assistant United States Attorney stated that "the 2:1 comparison of OxyContin to MSContin [sic] [wa]s one of the areas under investigation." *Id.* "Beginning in 2002 and continuing for the next several years, the government sought millions of documents from Purdue and conducted hundreds of interviews, some of which pertained to the relative potency and cost of OxyContin and MS Contin." *Id.*

On June 24, 2005, an attorney representing several Purdue employees spoke with a lawyer from the Department of Justice regarding topics to be discussed during those employees' grand jury testimony. *Id.* The Justice Department attorney indicated that she intended to (and subsequently did) ask the employees "about the dispute over the relative potency of OxyContin and MS Contin, among other topics, explaining that this related to the marketing and cost implications of the relative potencies." *Id.* Around that same time, the government began drafting a subpoena that "included requests for all documents discussing relative analgesic potency or safety of OxyContin and MS Contin." *Id.* Other documents under seal also reflect that prior to the filing of Radcliffe's suit, the government had made an additional request for the identity of "the author and source of different versions of a document . . . already in the government's possession" that questioned the 2:1 ratio between MS Contin and OxyContin. *Radcliffe*, 582 F. Supp. 2d at 775.

The government's investigation of Purdue's marketing claims continued after Radcliffe's execution of the Release. Indeed, on August 2, 2005, the day after Radcliffe signed the Release, the government subpoenaed Radcliffe to testify before the grand jury. *Id.* at 776. In September 2005, the Department of Justice provided Purdue's counsel with electronic search terms designed to identify documents pertaining

to the potency/cost issue. *Id.* Radcliffe filed his *qui tam* suit on September 27, 2005.[4]

On May 7, 2007, the government filed a notice that it would not intervene in the *qui tam* suit filed by Radcliffe. Two days later,

> the government filed a criminal information against a related Purdue entity and several Purdue executives, along with executed plea agreements for all the criminal defendants. Although the criminal charges did relate to the misbranding of OxyContin, these charges focused on Purdue's marketing of OxyContin as "less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

*Id.* (quoting Information ¶ 20, *United States v. Purdue Frederick Co.*, No 1:07-CR-00029 (W.D. Va.)). The misbranding charges did not pertain to the 2:1 ratio and although the plea agreements settled certain civil claims by the government, they did not address the claims made in the *qui tam* suit. *Radcliffe*, 582 F. Supp. 2d at 776.

### C.    Execution of the Release

In late June 2005, as part of a workforce restructuring that substantially reduced Purdue's sales force, Radcliffe was offered the option of transferring to a new position or accepting a severance package. Radcliffe opted to leave Purdue and, in exchange for his execution of the Release, he was given an enhanced benefits package to which he would not otherwise

---

[4]On December 5, 2005, the government filed a motion to stay Radcliffe's *qui tam* suit, arguing, *inter alia*, that allowing the suit to move forward would reveal, publicly, a portion of the grand jury's investigation. *Id.* The district court granted the stay and the government's investigation continued.

have been entitled, including more than $40,000 in salary payments. The Release, signed by Radcliffe on August 1, 2005, included the following relevant provisions:

4. (a) Employee . . . knowingly and voluntarily releases and forever discharges [Purdue] of and from any and all liability to Employee for actions or causes of action, suits, claims, charges, complaints, contracts (whether oral or written, express or implied from any source), and promises, whatsoever, in law or equity, which, Employee . . . ever had, may now have or hereafter can, shall or may have against [Purdue] as of the date of the execution of this Agreement, including all unknown, undisclosed and unanticipated losses, wrongs, injuries, debts, claim or damages to [Ratcliffe], for, upon, or by reason of any matter, cause or thing whatsoever.

5. To the maximum extent permitted by law, Employee agrees that Employee will not seek and waives any right to accept any relief or award from any charge or action against [Purdue] before any federal, state, or local administrative agency or federal, state or local court whether filed by Employee or on Employee's behalf with respect to any claim or right covered by paragraph 4.

16. THE PARTIES HAVE READ AND FULLY CONSIDERED THE AGREEMENT AND ARE MUTUALLY DESIROUS OF ENTERING INTO SUCH AGREEMENT. THE TERMS OF THIS AGREEMENT ARE THE PRODUCT OF MUTUAL NEGOTIATION AND COMPROMISE BETWEEN EMPLOYEE AND THE COMPANY. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE (i) HAS HAD AT LEAST FORTY-FIVE (45) DAYS TO CONSIDER THIS AGREE-MENT . . . (ii) HAS CAREFULLY READ THE

AGREEMENT AND THE DISCLOSURE STATE-
MENT IN THEIR ENTIRETY; (iii) HAS BEEN
ADVISED IN WRITING TO CONSULT WITH AN
ATTORNEY PRIOR TO EXECUTION OF THIS
AGREEMENT; . . . (v) HAS DISCUSSED IT
WITH INDEPENDENT LEGAL COUNSEL, OR
HAS HAD A REASONABLE OPPORTUNITY TO
DO SO . . . . HAVING ELECTED TO EXECUTE
THIS AGREEMENT, TO FULFILL THE PROM-
ISES  SET  FORTH  HEREIN,  EMPLOYEE
FREELY AND KNOWINGLY, AND AFTER DUE
CONSIDERATION,    ENTERS    INTO    THIS
AGREEMENT INTENDING TO WAIVE, SETTLE
AND  RELEASE  ALL  LIABILITY  FOR  AND
RECOVERY FROM CLAIMS EMPLOYEE EVER
HAD, NOW HAS OR MIGHT HAVE AGAINST
THE  COMPANY  AS  OF  THE  DATE  OF  THIS
AGREEMENT.

J.A. 134-35, 140-41.

### D.   Proceedings in the District Court

In response to Radcliffe's Third Amended Complaint, Pur-
due moved to dismiss, arguing in part that the Release was a
complete bar to Radcliffe's suit. To analyze the enforceability
of the Release, the district court applied "the framework
established by the Ninth Circuit in *United States ex rel. Green
v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995), and *United
States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d
230 (9th Cir. 1997)." *Radcliffe*, 582 F. Supp. 2d at 777.

Characterizing *Hall* as "an exception to the general rule
against enforcing pre-filing releases to bar subsequent qui tam
suits," *id.* at 779, the district court determined that "the critical
issue [was] the completeness of the government's knowledge
or the fullness of its investigation." *Id.* According to the dis-
trict court, "[p]artial knowledge or investigation on the part of

the government is insufficient to remove a case from the purview of *Green* into the exception created by *Hall*." *Id.* at 780. Therefore, even though "the government was aware of the substance of Radcliffe's allegations and had begun, but not completed, its investigation of these allegations as of the date of the Release," *id.* at 781, Radcliffe's ability "to supplement federal enforcement of the FCA by prosecuting these allegations on behalf of the government remains." *Id.* at 782.

Accordingly, the district court determined

> [t]he circumstances here fall within the general rule articulated in *Green* that pre-filing releases are unenforceable to bar subsequent qui tam actions, rather than the *Hall* exception, because the government had not fully investigated the substance of Radcliffe's allegations. Further, the public policy concerns raised by Purdue do not alter the relative balance of public interests under the *Rumery* test. The general release executed by Radcliffe does not bar this action.

*Id.* at 783.

In response to the Fourth Amended Complaint, Purdue renewed its claim of bar by virtue of the Release. However, the district court did not address the Release issue because it again granted Purdue's motion to dismiss on the grounds that Radcliffe's pleading failed under Rule 9(b). Purdue has properly preserved the issue concerning enforcement of the Release by filing a timely cross-appeal under Rule 4(a)(3) and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Standard of Review

The district court's order denied Purdue's motion to dismiss based on the Release. However, Purdue contends, and Radcliffe apparently agrees, that the district court actually

granted summary judgment to Radcliffe pursuant to Rule 56(c) on the Release issue.

> It is well settled that district courts may convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, allowing them to assess whether genuine issues of material fact do indeed exist. While it may be preferable for a district court to trigger this conversion explicitly, appellate courts may take the district court's consideration of matters outside the pleadings to trigger an implicit conversion of a Rule 12(b)(6) motion to one under Rule 56. The ability of appellate courts to perform this conversion *sua sponte* serves judicial economy . . . by sparing the district court an unnecessary remand. As the Supreme Court has noted: "It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."

*Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007) (internal citations omitted) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)); *see also Herbert v. Saffell*, 877 F.2d 267, 270 (4th Cir. 1989) (treating Rule 12(b)(6) motion as motion for summary judgment); *George v. Kay*, 632 F.2d 1103, 1106 (4th Cir. 1980) ("If it is necessary for the court to look beyond the pleadings, the 12(b)(6) motion must be converted into a motion for summary judgment and all parties must be given the opportunity to present materials pertinent to such a motion."). In this case the parties provided evidence and thoroughly briefed the Release issue to the district court, which clearly relied on the declarations and other exhibits presented when determining that the Release did not bar Radcliffe's *qui tam* suit. The parties have also relied on evidence relevant to the Release issue in their briefs submitted to this Court. The facts in the record appear to be generally

undisputed and we therefore find it proper to convert Purdue's "Rule 12(b)(6) motion to one under Rule 56" and thus consider the district court's ruling on that basis.

## III. Analysis

Upon his departure from Purdue, and in exchange for a considerable sum of money and other benefits to which he would not otherwise have been entitled, Radcliffe signed the Release, an exceedingly broad document. In the Release, Radcliffe agreed to "forever discharge[ ] [Purdue] of and from any and all liability *to Employee* for actions or causes of action, suits, [or] claims . . . whatsoever, in law or equity, which, Employee . . . ever had, may now have or hereafter can, shall or may have against [Purdue] as of the date of the execution of this Agreement . . . ." J.A. 134-35 (emphasis added). Radcliffe "enter[ed] into this agreement intending to waive, settle and release all liability for and recovery from claims [he] ever had, now has or might have against the company as of the date of this agreement." J.A. 141. Finally, he "waive[d] any right to accept any relief or award from any charge or action against [Purdue] before any . . . federal, state or local court . . . ." J.A. 136.

The FCA clearly provides that once a *qui tam* action is filed, the relator and the defendant may not settle (or at least may not voluntarily dismiss) the action. 31 U.S.C. § 3730(b)(1). The statute does not, however, address whether the relator's release of *qui tam* claims, executed before the filing of a complaint, is enforceable.

Purdue asserts that prefiling releases are presumptively enforceable and that enforcing such agreements in FCA cases is no different than what is done routinely in other cases involving "civil rights, antitrust, securities fraud, and RICO claims" where private enforcement deters conduct detrimental to the public. Br. of Appellee at 38. According to Purdue, "private *qui tam* suits are a hallmark of FCA enforcement

. . . . The government, and other private individuals, remain free to prosecute released claims." *Id.* at 40. In Purdue's view, enforcing the Release in this case upholds a number of important public policies, such as encouraging settlement, enforcing the sanctity of contract, supporting the use of general releases in the employment context, preventing unjust enrichment, and discouraging duplicity among contracting parties.

Radcliffe opposes enforcement of the Release, arguing that *qui tam* claims belong to the government, not the relator. In Radcliffe's view, he had no individual legally cognizable claim to release as of August 1, 2005 (the date he signed the Release) because he only became a partial assignee of the government's claim upon filing the complaint, not before. He further contends that, to be effective, "any release purporting to settle . . . *qui tam* claims and bar a *qui tam* action . . . must have the express consent of the Attorney General." Response and Reply Br. of Appellant at 42. Finally, he argues that enforcing prefiling releases undermines the purposes of the FCA.

The government, as amicus curiae, advances a somewhat middle-ground position in which it asserts that although pre-filing releases should generally be considered unenforceable, the district court "should have enforced the Release in this case." Amicus Br. at 3. This is so, the government argues, "because the relator's allegations of fraud were disclosed to the government independent of the filing of the *qui tam* action itself." *Id.* The government proposes adoption of a rule making an "FCA *qui tam* release[ ] . . . enforceable if the government has knowledge of the relator's allegations of fraud independent of the filing of the qui tam action itself." Amicus Br. at 12. This "government knowledge exception," the government argues, comports with the purposes of the FCA because it vindicates the public interest and simultaneously promotes "the orderly and efficient private resolution of FCA cases." Amicus Br. at 14.

Radcliffe, Purdue and the government agree that the enforceability of the Release should be evaluated using the test applied by the Supreme Court in *Town of Newton v. Rumery*, 480 U.S. 386 (1987). In *Rumery* the Supreme Court reiterated the well-established rule that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."[5] *Id.* at 392.

A.  Radcliffe's general release of claims did not require the government's consent to be effective.

As an initial matter, we do not accept Radcliffe's assertion that the Release was ineffective because the Attorney General did not "sign off" on it. In *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit rejected this same argument. We agree with that court's analysis.

The FCA provides that

> [a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

---

[5]As the district court correctly noted, we have not interpreted *Rumery* in the context of the FCA, though we have stated that "public policy is implicated only where 'it is explicit, well defined and dominant, and ascertainable by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Radcliffe*, 582 F. Supp. 2d at 778 n.9 (quoting *L & E Corp. v. Days Inns of Am., Inc.*, 992 F.2d 55, 58 (4th Cir. 1993)).

31 U.S.C.A. § 3730(b)(1) (West 2003); *see, e.g.*, *Webster v. United States*, 217 F.3d 843 at *1 (4th Cir. 2000) (Table) ("with the government's consent" relator "voluntarily dismissed her qui tam action without prejudice"). As the Tenth Circuit explained:

> [t]he statute itself only mentions the "dismissal" of a qui tam action and further requires the consent of the court. When there is a release preceding the filing of the qui tam action, as in this case, no action has been filed, so there is neither an action to dismiss nor a judge to consent to the agreement. As a consequence, the statute only governs the enforceability of settlement agreements made after the filing of a qui tam claim.

*Ritchie*, 558 F.3d at 1168 (citing *Green*, 59 F.3d at 960).

Section 3130(b)(1) manifests Congress' express intent to prohibit a relator's unilateral settlement of FCA claims, absent the government's consent, once a suit has been filed. If Congress specifically intended to preclude a relator from releasing his claims only with the Attorney General's consent prior to filing suit, it could have done so, but did not. "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . ." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005). Thus, the consent of the government is not a necessary condition precedent to enforcement of an otherwise valid release where such a release is executed prior to filing a *qui tam* action.

> B.   Radcliffe possessed a legally cognizable claim subject to the terms of the Release.

Radcliffe next argues that the plain language of the Release does not encompass his *qui tam* claims against Purdue. Specifically, in paragraph 4 he released Purdue from "*all liability*

*to Employee* for . . . claims . . . which Employee . . . ever had, may now have or hereafter can, shall or may have . . . *as of the date of the execution of this Agreement* [August 1, 2005]." Response and Reply Br. of Appellant at 54. Radcliffe asserts that as of the date the Release was executed, he had no FCA claim against Purdue. As support for this proposition, he relies on the Supreme Court's statement in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000), that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim." In Radcliffe's view, no such assignment occurred until he filed his complaint under seal with the district court, which occurred after he signed the Release. We disagree.

In *Vermont Agency*, the Supreme Court explained the three elements necessary to establish Article III standing. First, a plaintiff must establish that he suffered an "'injury in fact' . . . that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" 529 U.S. at 771 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Second, he must establish causation—a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant." *Vermont Agency*, 529 U.S. at 771 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)). Finally, "he must demonstrate redressability — a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vermont Agency*, 529 U.S. at 771 (quoting *Simon*, 426 U.S. at 45). Noting that in *qui tam* cases it is the government and not the relator that has sustained the injury-in-fact, the *Vermont Agency* Court held that a relator nonetheless possesses Article III standing to bring an FCA claim "because the [FCA] 'effect[s] a partial assignment of the Government's damages claim' and that assignment of the 'United States' injury in fact suffices to confer standing on [the relator].'" *Sprint Commc'ns Co. v. APCC Servs., Inc.*, ___ U.S. ___, 128 S. Ct. 2531, 2542 (2008) (quoting *Vermont Agency*, 529 U.S. at 773, 774). Thus, an "adequate basis for

the relator's suit for *his bounty* is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency*, 529 U.S. at 773 (emphasis added).

In the course of its analysis the Supreme Court further explained

> that the statute gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery. Thus, [the statute] provides that "[a] person may bring a civil action for a violation of section 3729 *for the person and for the United States Government*," § 3730(b).

*Id.* at 772.

According to Radcliffe's own allegations, the government suffered an "injury-in-fact" caused by Purdue's deceptive marketing of OxyContin's 2:1 equianalgesic ratio from 1995 to 2005. Thus, once the government suffered an injury (and Radcliffe became aware of the fraud causing the injury), Radcliffe had a statutory claim, and the necessary legal standing as partial assignee, to file a *qui tam* lawsuit.[6,7]

In short, he had "an interest in the lawsuit" regardless of when he opted to vindicate it.[8] The fact that Radcliffe chose

---

[6]Indeed, Radcliffe's attempts to settle his claims with Purdue in early 2005, via anonymous emails, indicates that even he understood that he had an FCA claim well before he signed the Release.

[7]We note that the elements of causation and redressability are not, in the context of Racliffe's allegations, at issue. Clearly, Radcliffe has alleged that the "cause" of the fraud was Purdue's marketing practices prior to his execution of the Release. There is also no doubt that, if violations of the FCA were eventually proven, monetary damages would be the appropriate remedy.

[8]This is not to say that Radcliffe possessed an indefinite, indefeasible claim. For example, another relator alleging the same fraudulent conduct

not to file suit until after signing the Release does not negate the fact that he had the *right* to file suit beforehand – a right he waived under the terms of the Release. *See* 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1545, pp. 351-353 (2d ed. 1990) ("[W]hen there has been . . . a partial assignment the assignor and the assignee each retain an interest in the claim and are both real parties in interest."). Because Radcliffe possessed a presently enforceable claim at the time he signed the Release, the plain terms of the Release encompassed *his* FCA claims.

C.   The Government's Knowledge

Having determined that Radcliffe's FCA claims were encompassed by the terms of the Release and that the Attorney General's consent to the Release was unnecessary, we next address, in a *Rumery* context, whether overriding public policy considerations nonetheless prevent enforcement of the Release. We hold that they do not under the facts of this case.

Most courts considering the enforceability of releases executed prior to filing an FCA suit, including the district court in this case, apply the analytical framework established by the Ninth Circuit in *Green* and *Hall*. *See, e.g.*, *Ritchie*, 558 F.3d at 1169; *United States ex rel. McLean v. County of Santa Clara*, No. C05-01962, 2008 WL 1947015 (N.D. Cal. Apr. 30, 2008); *U.S. ex rel. El-Amin v. George Washington Univ.*, No. 95-2000, 2007 WL 1302597 (D.D.C. May 2, 2007); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815 (S.D. Tex. 2007); *United States ex rel. Bahrani v. ConAgra, Inc.*, 183 F. Supp. 2d 1272 (D. Colo. 2002).

---

could have preempted Radcliffe's suit or Radcliffe could have let the statute of limitations expire. *See* 31 U.S.C. § 3730(b)(5) (barring a relator from bringing "a related action based on the facts underlying [a] pending action"). The Release, of course, did not prohibit the government or another relator from pursuing similar claims against Purdue.

*Green* involved an employee who, during his tenure with a defense contractor, alleged that the company "had 'double charged' the U.S. Air Force for equipment procured for the B-2 bomber program" and that he had been discharged for raising the overcharges with company officials. *Green*, 59 F.3d at 956. Green filed suit against his former employer, asserting various state-law claims arising out of his termination. *Id.* The parties eventually reached a settlement and Green signed a general release resolving "all of the matters which [had] arisen between them including but not limited to disputes relating to or arising out of the [lawsuit] and Green's employment with and separation from" the company. *Id.* Green subsequently filed a *qui tam* suit against his former employer alleging fraudulent conduct subject to the FCA.

The Ninth Circuit concluded "that enforcing the release . . . would impair a substantial public interest" and declined to enforce Green's release. *Id.* at 963. The court deemed it "critical" to its analysis, however, "that the government only learned of the allegations of fraud and conducted its investigation *because of the filing of the qui tam complaint.*" *Green*, *id.* at 966. After considering additional interests favoring enforcement, the *Green* Court determined "that application of the *Rumery*[ ] test compels the conclusion that prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." *Id.* at 969.

A few years after its decision in *Green*, the *en banc* Ninth Circuit upheld a prefiling release in *Hall* because, contrary to the facts in *Green*, "the government had full knowledge of the . . . charges and had investigated them before" the relator and the defendant settled. *Hall*, 104 F.3d at 231. In *Hall*, the court specifically stated that its "refusal to enforce the release in *Green* turned on the public interest in learning about claims of government contractor fraud, and upon the fact that in that case, the government had not been aware of [the relator's] allegations at the time of the settlement release." *Id.* at 233.

But because the government was aware of and had investigated the claims raised by the relator in *Hall*, "the public interest in having information brought forward that the government could not otherwise obtain [was] not implicated." *Id.*

> In *Green* and *Hall*, the Ninth Circuit focused heavily upon the federal interest in the disclosure of fraud. In *Green*, the government had no knowledge of the fraud prior to the filing of the qui tam suit, while in *Hall* the government had already been apprised of the allegations due to prior disclosures [by the defendant] to a federal agency.

*Ritchie*, 558 F.3d at 1170.

Purdue asserts that independent of any contribution from Radcliffe, the government's long-standing investigation of Purdue's marketing of OxyContin had specifically come to include the precise focus of Radcliffe's suit: "'whether Purdue falsely marketed OxyContin as being twice as potent . . . and, accordingly, less expensive than MSContin [sic] and the accuracy of 'the 2:1 comparison of OxyContin to MSContin [sic].'" *Radcliffe*, 582 F. Supp. 2d at 781. Purdue points out that not only did the government already have access to the documents Radcliffe would subsequently attach to his complaint, it also had high-level documents to which Radcliffe would not have had access as an employee. This is not, therefore, a suit based on information that was otherwise unavailable to the government. As such, Purdue argues, this is not a case where public policy precludes enforcement of the Release.

Radcliffe argues that for the *Hall* exception to apply, and thus for the Release to be enforceable, the government must (1) have known the substance of the relator's allegations, and (2) have *fully* investigated them by the time a release was signed. Radcliffe asserts that in refusing to enforce the Release, the district court correctly focused on the fact that

the government "had begun, but not completed, its investigation of these allegations as of the date of the release." *Id.* at 781.

The government, as amicus, contends the Release should be enforced in this case because the government's knowledge of a relator's allegations of fraud vindicates the public interest goals of the FCA. The government asserts that such a "government knowledge" rule combats any attempt by defendants to buy relators' silence and encourages defendants' disclosure of fraud and cooperation with investigations. The government contends that by relying on the fact that it "had not *fully* investigated the substance of Radcliffe's allegations," *id.* at 783 (emphasis added), the district court erroneously applied the *Green*/*Hall* analysis. This is so, the government argues, because the district court's reasoning overlooks the primary purpose of requiring disclosure of fraud allegations, "which is not to ensure that the government exhaustively investigates and prosecutes every allegation of fraud, but rather that it has an adequate *opportunity* to do so." Amicus Br. at 16. According to the government, giving conclusive weight to the completeness of its investigation as a condition of enforcing an FCA release could lead to an inappropriate, time-consuming, and amorphous inquiry into the government's internal investigative deliberations and processes. Moreover, such a "completed investigation rule" contradicts 31 U.S.C. § 3730(b)(2), which grants the government discretion under the FCA to initiate or participate in an FCA action without precondition.

The district court identified several interests to be considered when enforcing a release of *qui tam* claims, including "the public interest in having relators disclose inside information of alleged fraud to the government, in having relators supplement federal enforcement of the FCA by assisting the government in its investigation and prosecution or prosecuting the claim itself, and in deterring future fraud against the government." *Radcliffe,* 582 F. Supp. 2d at 782. The district court acknowledged that "the government [learned] of the

substance of Radcliffe's allegations independently and was interested enough in them to request documents pertaining to and question various Purdue employees about the relative cost and potency issue." *Id.* Noting that the government's investigation eventually went "in a different direction" and the final settlement did not refer to the issue raised by Radcliffe, the district court ultimately concluded that Radcliffe's continued "ability to supplement federal enforcement of the FCA by prosecuting these allegations" best served the public interest. *Id.* The district court "believe[d] that enforcing the release under these circumstances would substantially impact important public interests associated with the FCA," *id.*, and that "the fullness of [the government's] investigation" was a necessary condition precedent to the enforceability of a release. *Id.* at 779-80. We disagree.

The Tenth Circuit recently addressed analogous issues and determined that "[b]ecause the federal interests served by enforcing releases signed after disclosure to the federal government outweigh the interests served by not enforcing them, . . . the releases [were] enforceable." *Ritchie*, 558 F.3d at 1163. In *Ritchie*, the defendant self-reported fraud to the government, which conducted its own audit and investigation. *Id.* The relator assisted the government in its investigation but subsequently settled claims that the company retaliated against her "because of her whistleblowing activities." *Id.* at 1165. As a result of the settlement, in which she agreed to leave the company, the relator signed two releases purporting to waive "any and all claims [she] might have under federal, state or local law." *Id.* Ten days after signing the second release she filed a *qui tam* action against her former employer. *Id.*

Despite the relator's contentions that "the government lacked full knowledge of the scope of the fraud at the time she signed the release," *id.* at 1170, the Tenth Circuit affirmed the district court's enforcement of the release. In doing so, the court of appeals determined that "[t]he disclosures to the gov-

ernment in this case were sufficient to satisfy the public interest in uncovering fraud." *Id.* According to the court of appeals, "[e]nforcing releases of qui tam claims only when the allegations of fraud have been disclosed to the government before the release . . . has the benefit of encouraging voluntary disclosure by government contractors." *Id.*

In *Ritchie*, "the federal government had not issued its final audit report when the settlement was reached or the qui tam suit was filed." *Id.* at 1171. Accordingly, the circuit court recognized, as did the district court in this case, that under such circumstances an interest in having private citizens supplement federal enforcement remains, but "[o]n balance . . . that interest does not outweigh the federal interests served by enforcement of settlements following disclosure of fraud allegations to the government, namely the interest in disclosure of fraud allegations and the interest in encouraging settlement." *Id.*

This is so, in part, because

> [c]ontractors . . . have an interest in settling qui tam claims prior to the filing of a lawsuit. If they can settle qui tam claims only after fraud allegations have been disclosed to the government, then contractors effectively have an incentive to disclose. On policy grounds, then, conditioning the enforceability of releases of qui tam claims upon the prior disclosure of the fraud allegations to the government promotes the federal interest in uncovering fraud against the government.

*Id.* at 1170. Enforcing prefiling releases also encourages the settlement of disputes.[9] *See Crandell v. United States*, 703

---

[9]The government also points out that if it has knowledge of the alleged fraud, "[s]uch . . . knowledge . . . reduces the perverse incentive a *qui tam* defendant would otherwise have to buy the silence of relators, because that defendant faces the real threat of an independent government action." Amicus Br. at 13.

F.2d 74, 75 (4th Cir. 1983) ("Public policy, of course, favors private settlement of disputes.").

When the government is unaware of potential FCA claims the public interest favoring the use of *qui tam* suits to supplement federal enforcement weighs against enforcing prefiling releases. But when the government is aware of the claims, prior to suit having been filed, public policies supporting the private settlement of suits heavily favor enforcement of a prefiling release. We therefore agree with the government that "[t]he proper focus of the inquiry is whether the allegations of fraud were sufficiently disclosed to the government, not on whether the government's investigation was complete." Amicus Br. at 17. We find that application of this "government knowledge" rule meets the balancing analysis required under *Rumery*. Thus, we concur with the Tenth Circuit that when, as in this case, the government was aware, prior to the filing of the *qui tam* action, of the fraudulent conduct represented by the relator's allegations, the public interest has been served and the Release should be enforced.

Accordingly, because the "allegations of fraud were sufficiently disclosed to the government" prior to Radcliffe's filing of the *qui tam* suit, the district court erred in failing to enforce the Release as a bar to Radcliffe's claims.

## IV. Conclusion

Although we conclude that the district court erred in its decision not to enforce the Release, we nonetheless affirm the judgment dismissing Radcliffe's suit with prejudice. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[T]he decision of a lower court . . . must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason . . . . It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground . . . ." (internal quotation marks

omitted)); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002) (observing that we "can affirm on any basis fairly supported by the record").

Accordingly, the judgment of the district court will be affirmed.

*AFFIRMED*