USA ex rel. v. Exelis, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

--------

August Term, 2014

(Argued:  May 28, 2015                    Decided:  May 25, 2016)

Docket No. 14-4155

_____

UNITED STATES OF AMERICA ex rel. Michael A. LADAS,

Plaintiff-Appellant,

- v. -

EXELIS, INC., ITT POWER SOLUTIONS, INC., and INNOVATIVE MOLD
SOLUTIONS, INC.,

Defendants-Appellees.[*]
_____

Before:  KEARSE, POOLER, and DRONEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of
Connecticut, Alfred V. Covello, Judge, dismissing qui tam action brought on behalf of the United States
under the False Claims Act, 31 U.S.C. § 3729 et seq.  The court dismissed plaintiff's Substitute Second
Amended Complaint in part for lack of standing due to a release given by plaintiff to two defendants,
and in part for failure to plead the fraud claims with sufficient particularity.  Plaintiff challenges those

---

[*]    The Clerk of Court is instructed to amend the official caption to conform with the
       above.

rulings and contends that he should have been granted leave to further amend the Substitute Second Amended Complaint.

Affirmed on the ground that plaintiff did not plead the fraud claims with sufficient particularity and that the district court did not abuse its discretion in denying leave to amend.

> TODD D. STEIGMAN, Hartford, Connecticut (Peter B. Prestley, Madsen, Prestley & Parenteau, Hartford, Connecticut; Steven A. Skalet, Teresa Yeh, Mehri & Skalet, Washington, D.C., on the brief), for Plaintiff-Appellant.
>
> MATTHEW A. FITZGERALD, Richmond, Virginia (John D. Adams, Alexander J. Brackett, Jeremy S. Byrum, McGuireWoods, Richmond, Virginia, on the brief), for Defendants-Appellees Exelis, Inc., and ITT Power Solutions, Inc.
>
> CHRISTOPHER C. PALERMO, White Plains, New York (Bleakley Platt & Schmidt, White Plains, New York; Neil Matthew Merkl, Kelley Drye & Warren, New York, New York, on the brief), for Defendant-Appellee Innovative Mold Solutions, Inc.

KEARSE, Circuit Judge:

Plaintiff Michael A. Ladas, a former employee of defendant ITT Power Solutions, Inc. ("Power Solutions"), appeals from a judgment of the United States District Court for the District of Connecticut, Alfred V. Covello, Judge, dismissing his qui tam action brought on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 et seq. (or "FCA"), against Power Solutions et al. for alleged fraud in representations made to the United States in connection with certain equipment supplied to the government pursuant to a procurement contract. The court dismissed Ladas's Substitute Second Amended Complaint (or "SSAC") in part pursuant to Fed. R. Civ. P. 12(b)(1), ruling that Ladas

had released his claims against Power Solutions and its parent corporation and thus lacked standing to bring claims against them, and in part pursuant to Fed. R. Civ. P. 9(b) on the ground that the fraud claims were not pleaded with the requisite particularity. On appeal, Ladas argues principally that his claims against Power Solutions and its parent are not barred by his release agreement and that his complaint satisfied the requirements of Rule 9(b). He also contends that the district court abused its discretion by not allowing him to amend the Substitute Second Amended Complaint. For the reasons that follow, although we do not endorse the district court's ruling on the enforceability of the release, we affirm the dismissal of the Substitute Second Amended Complaint--without leave to amend further-- for failure to plead fraud with the requisite particularity.

## I. BACKGROUND

The Substitute Second Amended Complaint, along with portions of the motion papers supporting defendants' motions to dismiss and the opinion of the district court granting those motions, as well as the briefs and most of the record on this appeal, have been filed under seal; they are hereby deemed unsealed to the extent that their contents are quoted or described in this opinion. The following description reflects allegations in the Substitute Second Amended Complaint, taken as true for purposes of reviewing a dismissal pursuant to Rule 9(b), see, e.g., Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

A. The Government Contract and the Equipment Produced

In 2005, Power Solutions's then-parent, ITT Corporation ("ITT"), was awarded a contract to provide the United States with equipment that included certain devices and apparatus to supply the devices with power (the "Contract"). The Contract required that the devices, their component parts, and their supporting apparatus meet particular specifications for, inter alia, form, fit, and function, as well as for logistics with regard to replacement parts. Equipment produced after any change to the manufacturing materials or process that had potential for causing a deviation from Contract specifications was required to be subjected to product qualification tests; such changes were also required to be submitted to the government for its approval.

Power Solutions entered into a subcontract with defendant Innovative Mold Solutions, Inc. ("IMS"), pursuant to which IMS would manufacture casing components for the devices' power-supply apparatus. Components manufactured by IMS were delivered to Power Solutions, which sent them to another ITT business unit for assembly of the devices and the accompanying apparatus (hereinafter the "assembly division"), and for shipment to the government. Delivery of the equipment to the government began in the fourth quarter of 2007.

In November 2007, IMS made substantial changes in the manufacture of the power-supply case component, using a less expensive adhesive material and changing the process it used to apply that material. An engineering professor had alerted an assembly-division employee that a change in application method would require significant additional testing to ensure the apparatus' reliability and endurability; but no new product qualification testing was performed, and the changes were not submitted to the government for approval. The SSAC alleged that IMS made the changes in 2007 in collusion with the assembly division and did not disclose these changes to Power Solutions.

4

The SSAC alleged generally that IMS's changes affected compliance with Contract specification requirements and would affect the function of the equipment, causing the devices to function incorrectly or not at all. Power Solutions engineers were aware that a process change had occurred with potential to significantly affect the quality and function of the power-supply apparatus; and in a 2007 meeting with IMS, they complained of defects in some of the components IMS had shipped. IMS denied having made any changes. Power Solutions rejected the defective parts based on their noncompliance with an internal ITT specification.

In February 2009, Power Solutions began documenting problems with the IMS-manufactured power-supply case components, noting various types of degradation. Power Solutions's general manager decided, however, that the IMS components should be sent on to the assembly division without awaiting complete test results. In May 2009, Power Solutions contacted IMS's adhesive-application supplier to review the process being used, and learned that IMS had taken over that supplier's role more than two years earlier. IMS then, realizing what Power Solutions had learned, finally admitted that IMS had introduced changes in 2007. Employees of the assembly division met with IMS to discuss the matter; Ladas, who was responsible for ensuring and improving the quality of Power Solutions products, was not included in the meeting.

Ladas was Director of Quality at Power Solutions from 2006 until March 2010; he reported to the head of quality assurance at the assembly division. In mid-2009, after Power Solutions quality-assurance personnel had become aware of the significant changes to IMS's manufacturing process, the Power Solutions quality-assurance department advocated disclosure of the Contract violations to the government--as required by the Contract--and drafted a request for a government

waiver of the deviations and a proposal for corrective action. The deviation waiver request was initially approved by the assembly division but was never sent to the government.

Instead, assembly-division employees sent the government a "white paper" (the "White Paper") and an accompanying letter (collectively the "2009 Letter") stating falsely that ITT had only recently become aware of a change in the IMS application process--a change they described misleadingly--stating that no tests had identified degradation or failure in the metalized area of the components, and stating falsely that the adhesive used had not changed. The 2009 Letter stated that there was no major or functional change having any potential to affect any specification requirement. ITT continued to ship devices to the government, fraudulently certifying that they had been produced in accordance with Contract specifications and requirements. The government placed at least one additional order after receiving the 2009 Letter.

After learning of the assembly division's "false, deceptive and misleading" 2009 Letter to the government, the Power Solutions quality-assurance department prepared, in or about March 2010, a second deviation waiver request for submission to the government, detailing "the true" changes. (SSAC ¶ 90.) This request also was not sent to the government.

B. The Release of Ladas and the Dismissal of the Present Action

On March 31, 2010, Ladas's employment with Power Solutions was terminated. Ladas signed a separation agreement ("Separation Agreement" or "Agreement") in which he, inter alia, agreed to release "all claims or demands [he] may have arising out of or relating to [his] employment," including "any rights or claims [he] may have under . . . federal . . . laws" (the "Release"). The Agreement, which is in the district court record as an unsealed document, stated that the Release "shall

6

be construed in the broadest sense possible and shall be effective as a prohibition to all claims . . . and causes of action of every character, nature, kind or description, known or unknown, and suspected or unsuspected."

Ladas commenced the present qui tam action under the False Claims Act in July 2010 and a month later filed an amended complaint. Ladas alleged that Power Solutions, IMS, and ITT had knowingly made to the United States false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A); had knowingly created and used, or caused to be used, false records or statements material to such claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(B); and had conspired to make such claims or statements, in violation of 31 U.S.C. § 3729(a)(1)(C). In or about 2011, ITT spun-off its defense-contracting business--including Power Solutions and the assembly division--to a new company, Exelis, Inc. Exelis was thereafter substituted for ITT as a defendant.

Defendants--after being served with process in late 2011 following the government's election not to intervene--moved to dismiss the amended complaint; those motions were mooted by the district court's granting a motion by Ladas to file a further amended pleading. Ladas filed the Substitute Second Amended Complaint in November 2013, and defendants moved to dismiss the SSAC. IMS sought dismissal pursuant to Rules 12(b)(6) and 9(b) for failure to state a claim and for failure to plead fraud with sufficient particularity. Power Solutions and Exelis moved to dismiss pursuant to Rule 12(b)(1) on the ground that Ladas lacked standing to pursue claims against them because of the Release to which he agreed in the Separation Agreement, and pursuant to Rule 9(b) on the ground that the SSAC "fails to identify a single false claim submitted to the government, or even one [device] sold to the [government] that did not meet contract specifications[ and] . . . . fails to identify a single false

certification of compliance, express or implied" (ITT Defendants' Motion To Dismiss the Second Amended Complaint, dated December 20, 2013, at 1).

In a sealed Ruling on the Defendants' Motion To Dismiss, dated September 30, 2014 ("D.Ct. Ruling"), the district court granted the motions to dismiss pursuant to Rules 12(b)(1) and 9(b), and Ladas has appealed. After oral argument of this appeal, Ladas, with the consent of the United States, withdrew his appeal as to IMS, with prejudice; he now challenges the dismissal of his claims only against Power Solutions and Exelis.

## II. DISCUSSION

Ladas contends principally (1) that his claims against Power Solutions and Exelis are not within the scope of the Release, or that if they are, the Release is unenforceable as a matter of public policy; and (2) that the Substitute Second Amended Complaint satisfied the requirements of Rule 9(b). He also contends that the district court abused its discretion by not allowing him to file another amended complaint. For the reasons that follow, we affirm the dismissal of Ladas's claims against Power Solutions and Exelis for failure to plead fraud with the requisite particularity; and we see no abuse of discretion in the court's refusal to allow Ladas to amend again.

## A. Enforceability of the Release

The district court ruled that Ladas lacked standing to bring the present action against Exelis and Power Solutions because he had "released ITT from any claims 'arising out of . . . [his] employment' and any claims arising from any 'federal, state, or local laws,'" noting that the document

8

contains "several references to a 'release of all claims' or a 'complete release of liability'" and states that the "'release shall be construed in the broadest sense possible.'" D.Ct. Ruling at 13-14. The court concluded that the Release "includes the qui tam claims" because they "are based on information that [Ladas] learned as an employee of ITT, and therefore, they are subject to the terms of the release contained in the Separation Agreement." Id. at 14. Relying in part on United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319 (4th Cir.) ("Radcliffe"), cert. denied, 562 U.S. 977 (2010), the district court also concluded that public policy did not make Ladas's release unenforceable, noting that

> [i]n the FCA context, courts have recognized that a release of the right to bring a qui tam action is unenforceable where the government would have no other way of learning of the FCA violation. U.S. ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319, 332 (4th Cir. 2010)[.] "[W]hen the government is unaware of potential FCA claims the public interest favoring the use of qui tam suits to supplement federal enforcement weighs against enforcing prefiling releases." Id. at 332.
>
> However, where the fraud has been sufficiently disclosed to the government, "public policies supporting the private settlement of suits heavily favor enforcement of a prefiling release." U.S. ex rel. Radcliffe, 600 F.3d at 332 . . . .

D.Ct. Ruling at 15-16 (footnote omitted). The district court found that

> [h]ere, the allegations of fraud were sufficiently disclosed to the United States . . . before Ladas signed the Separation Agreement. . . . [In June 2009,] ITT notified the [government] of the process and epoxy change in the "white paper" and accompanying note. This disclosure put the [government] on notice that the . . . epoxy application process had been changed and gave the [government] sufficient information to investigate the alleged fraud if it chose to do so.
>
> Since the government was sufficiently informed of the alleged fraud prior to Ladas signing the Separation Agreement, and the purpose of the FCA is not threatened, the court concludes that the release is enforceable.

Id. at 16-17 (emphases added).

We disagree with the district court's description and assessment of ITT's disclosures to the government. Assuming that Ladas's release was sufficiently broad to encompass his qui tam claims, we hold that the release is unenforceable as a matter of public policy.

A person pursuing a qui tam action under the False Claims Act--the relator--asserts a claim based on a right belonging to the United States. See generally Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1 (2000). The goal of the FCA's qui tam provisions is to prevent and rectify frauds by government contractors, by incentivizing private individuals to uncover and prosecute FCA claims. See, e.g., United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 18 (2d Cir. 1990); United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1168 (10th Cir. 2009) ("Ritchie"); United States ex rel. Green v. Northrop Corp., 59 F.3d 953, 963-65 (9th Cir. 1995) ("Green"), cert. denied, 518 U.S. 1018 (1996).

In Green, the Ninth Circuit considered whether a release of a qui tam claim, "when entered into without the United States' knowledge or consent, and prior to the filing of an action based on that claim, is enforceable," 59 F.3d at 956; it concluded that such a release would be unenforceable because it would "impair a substantial public interest" by nullifying the incentives the FCA gives to file such claims, id. at 963. In the case before it, the Green court assumed for purposes of analysis that the release in fact encompassed the asserted qui tam claim; however, given that the government had "only learned of the allegations of fraud and conducted [an] investigation because of the filing of the qui tam complaint," id. at 966 (emphasis in original), the court concluded that that facet of the release was unenforceable as contrary to public policy.

Thereafter, the Ninth Circuit distinguished Green and enforced a pre-filing release where "[t]he federal government" had been "aware of [the relator's] allegations regarding false certifications."

10

United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233 (9th Cir. 1997) ("Hall"); see id. at 231 ("the government had full knowledge of the plaintiff's charges and had investigated them before [the release]"). In that circumstance, "the public interest in having information brought forward that the government could not otherwise obtain [was] not implicated." Id. at 233.

Courts have widely applied the framework reflected by Green and Hall, "focus[ing] . . . the inquiry [on] whether the allegations of fraud were sufficiently disclosed to the government" to make enforcement of the release consistent with public policy. Radcliffe, 600 F.3d at 332 (internal quotation marks omitted); see id. at 329 (collecting cases). In Ritchie, the court concluded that the releases signed by the relator were enforceable because when they were signed, her employer had already "disclosed the fraud allegations to the federal government," 558 F.3d at 1163, albeit stating that it believed the allegations lacked merit, see id. at 1170. In response to the disclosures, the government conducted its own inquiry into the matter. Although the relator characterized the defendant's communication as a "'whitewash,'" the court held that the disclosures themselves "were sufficient to satisfy the public interest in uncovering fraud." Id. In Radcliffe, the court concluded that the relator's 2005 release, signed before his qui tam suit alleging that his former employer ("Purdue") had defrauded the government by representing that its pain-relief drug OxyContin was a cheaper alternative to the Purdue-produced drug it replaced (MS Contin), was enforceable because such allegations were already known to the government. See 600 F.3d at 323 ("Beginning in 2002 and continuing for the next several years, the government sought millions of documents from Purdue and conducted hundreds of interviews, some of which pertained to the relative potency and cost of OxyContin and MS Contin." (internal quotation marks omitted)). The Radcliffe court concluded that "the allegations of fraud were sufficiently disclosed to the government prior to Radcliffe's filing of the qui tam suit." Id. at 333

11

(internal quotation marks omitted). See also United States ex rel. Longhi v. Lithium Power Technologies, Inc., 575 F.3d 458, 474 (5th Cir. 2009) (affirming refusal to enforce a post-filing release, noting that "'a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement[,]' [Town of Newton v. ]Rumery, 480 U.S. [386,] 392 [(1987)]," and stating that the "public policy interest implicated in [a qui tam] case is the ability of the Government to obtain information from relators it could not otherwise obtain"), cert. denied, 559 U.S. 1067 (2010).

Applying this framework in the present case, we hold that Ladas's release is unenforceable as a matter of pubic policy because the record belies the district court's conclusion that the government had sufficient knowledge of Ladas's allegations of fraud or of any related fraud allegations.

Notably, the district court's factual description of the disclosure ITT made to the government is not supported by the record. Although the district court stated that "ITT notified the [government] of the process and epoxy change in the 'white paper' and accompanying note," D.Ct. Ruling at 16 (emphasis added), the White Paper and the accompanying letter in fact disclosed only a change in "method" or "process," not the change in adhesive. Indeed, the conclusion the White Paper expressed, that the change in process should have no significant effect, was premised on its explicit-- and false--statement that the adhesive used in the original process and the new process was "the same."

Moreover, the ITT representations repeatedly emphasized that the change in process was inconsequential. The White Paper stated that there would be "no difference" in electrical conductivity and that the process change would not impact electrical performance. Similarly, the accompanying letter claimed that "there was not a functional change" that had the "potential to affect any specification

12

requirement." The letter even characterized the change as so minor that ITT was not contractually required to notify the government of it.

The letter's partial disclosure--and the White Paper's affirmative misrepresentation as to the lack of change in the material used--did not give the government any notice as to false statements or allegations of fraud. Further, even if the White Paper or the accompanying letter had disclosed both the change in process and the change in adhesive, those disclosures would not have alerted the government that the proffered statements as to the effect of the changes were false. Nothing in these two documents indicated to the government that there was any fraud or that anyone had alleged fraud.

Exelis and Power Solutions urge us to view an Independent Monitor Report, which contained notes describing a September 2009 interview with Ladas, as giving the government the requisite information. Even assuming that such a report to the government is an appropriate consideration on a motion under Rule 12(b)(1)--and we note that the district court did not cite that document--the report itself was insufficient to alert the government to ITT's misrepresentations or Ladas's allegations of fraud. For example, while the report stated that "a concern" with respect to IMS had been raised by a different ITT employee who believed that "the matter" had not been handled properly, the report characterized Ladas as "not shar[ing]" the other employee's view and as believing instead that ITT had acted properly. Further, while the report described Ladas as mentioning both a process change and a change in "'material,'" it stated that ITT had communicated "the fact of the change" (singular) to the government, and the only change the report described Ladas as having said was disclosed to the government was the change of process. Given the White Paper's express representation that the adhesive material used in both processes was "the same," the report did not make the government sufficiently aware of fraudulent claims or false statements.

None of the cases relied on by the district court are similar to this one. In <u>Hall</u>, <u>Ritchie</u>, and <u>Radcliffe</u>, as described above, releases of <u>qui tam</u> claims were found not to be contrary to public policy where the government had been alerted to the relator's allegations of fraud or to related allegations of fraud. Here, in contrast, ITT's representations to the government were that there had been a change in methodology and that the change was inconsequential. ITT's assertion that there was no functional change was not accompanied by disclosure that anyone had alleged otherwise, ITT's communication gave the government no apparent reason for the government to suspect fraud, and the government did not conduct its own inquiry. While a company's disclaimers accompanying its disclosure of fraud allegations may not negate government knowledge when the government then proceeds to investigate the allegations, we decline to impute to the government knowledge based solely on documents saying that nothing is wrong--and especially on documents that so state based on half-truths and affirmative misrepresentations.

In sum, although the right to bring a <u>qui tam</u> suit can be released when the government has knowledge of the relator's fraud allegations, we do not endorse the district court's conclusion that the government had such knowledge in this case.

B. <u>The 9(b) Ruling</u>

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this Rule, a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir.

14

1994) (internal quotation marks omitted). "The purpose of Rule 9(b) is threefold--it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted). "We recognize and rigorously enforce these salutary purposes of Rule 9(b)." Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990). A dismissal pursuant to Rule 9(b) is reviewed de novo. See Stevelman v. Alias Research Inc., 174 F.3d 79, 83 (2d Cir. 1999).

The Rule 9(b) principles apply to complaints filed under the False Claims Act, see, e.g., Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476 (2d Cir. 1995), cert. denied, 517 U.S. 1213 (1996), which, to the extent invoked by Ladas, subjects to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States government, 31 U.S.C. § 3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to [such] a false or fraudulent claim," id. § 3729(a)(1)(B), or "conspires to commit [either] violation," id. § 3729(a)(1)(C). A claim is false within the meaning of the FCA if it "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes v. Straus, 274 F.3d 687, 698 (2d Cir. 2001) ("Mikes") (emphasis added). Not every breach of a federal contract gives rise to FCA liability, see id. at 697, but a defendant is liable when it "submits a claim for reimbursement while knowing . . . that payment expressly is precluded because of some noncompliance by the defendant," id. at 700; accord United States ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 268-69 (5th Cir. 2010) ("The FCA is not a general enforcement device for federal statutes, regulations, and contracts. . . . [A] false certification

15

of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance." (internal quotation marks omitted)).

In the present case, the implication of the SSAC was that ITT delivered to the government devices that did not conform to the Contract, while certifying that the devices did so conform. The SSAC alleged that "required forms" relating to quality assurance and payment "were filed with the U.S. upon shipping, certifying that 'listed items . . . conform to contract . . . .' with respect to altered products manufactured and delivered between August 2007 and the spring of 2011." (SSAC ¶ 62 (ellipses in SSAC).) This, however, is the Substitute Second Amended Complaint's only express reference to an allegedly false statement made to the government by defendants in connection with a claim for payment.

The SSAC alleged that ITT failed to comply with the Contract in three ways, but not specifically in connection with allegedly false statements material to any allegedly false claim for payment. First, it conclusorily alleged that the devices delivered to the government failed to comply with contractual specification requirements; but the only uncomplied-with specification identified in the SSAC was an internal ITT specification that was not part of the Contract. While the Contract contains specifications regarding the ability of the devices to withstand sustained exposure to high temperatures and humidity, the SSAC did not allege that the devices delivered to the government failed to meet those specifications.

Although the SSAC contained hypotheses as to how problems with "the integrity of the power supply case's surface" (SSAC ¶ 60) could affect the devices ordered by the government, the only factual allegation concerning the actual condition of the equipment upon or after delivery to the

16

government was that one government investigator observed that power-supply casings made after 2007 were "discolored and pitted after 3-4 years in the field," whereas those made using the original adhesive and application process continued to be "shiny with no degradation after 7-8 years of use" (id. ¶ 61). Even leaving aside the mathematical implausibility of the SSAC's allegation in 2013 as to an evaluation of "7-8 years[']" use of items that were first delivered in 2007, we see in the SSAC no allegation that the seemingly aesthetic deficiencies in the power-supply casings had in fact affected the form, fit, or function of any device. Nor was there any allegation that the observed occurrences after a period of even 3-4 years indicated any noncompliance with the Contract, which imposed a minimum warranty requirement of one year.

Second, the SSAC alleged that Power Solutions and ITT failed to perform required testing. But that alleged failure pertained to testing the power-supply casing components and the adhesives used in those components, whereas what the Contract called for was testing of the devices. The SSAC asserted that the required testing regime was not followed; that the impact on field reliability and endurability of the components was not studied; and that oxidation, peeling, or degradation with respect to power-supply casings would cause the devices to function incorrectly or not at all. These are conclusory statements, and the SSAC did not plausibly allege that the devices themselves, or the equipment as a whole, were not tested in accordance with the Contract.

Third, the SSAC alleged that ITT failed to seek or obtain approval for changes to the product that affected the functioning of the devices; but to the extent that paragraphs of the SSAC could be read to allege that the changes actually had such an effect--in contrast to allegations that hypothesized that there would be such an effect--those paragraphs were also conclusory and not supported by particularized allegations of fact. There were allegations that certain internal quality-

17

control processes at Power Solutions detected problems at a higher rate following the changes made by IMS; but the SSAC did not allege that those power-supply cases that Power Solutions found defective were accepted; or that any defects not detected by Power Solutions escaped detection in further testing performed at the assembly division; or that any defective cases were incorporated into finished devices; or that any finished devices that failed required testing were actually delivered to the government.

In sum, the SSAC did not contain plausible allegations of fact that showed, as required for FCA purposes, that any claim for payment submitted by Power Solutions, ITT, or Exelis was false or that any of the devices delivered to the government failed to meet Contract specifications. The district court found that the SSAC "does not include the specifics of any claims submitted by IMS or ITT to the government," D.Ct. Ruling at 21, and it properly concluded that the SSAC's allegations of substantive FCA violations failed to meet the above standards of particularity. In addition, the court concluded that Ladas's claim of conspiracy to violate the FCA was deficient because the SSAC "fails to identify a specific statement where IMS and ITT agreed to defraud the government." Id. at 22-23.

Because the court had concluded that Ladas lacked standing to pursue his claims against Power Solutions and Exelis, its dismissal of the claims pursuant to Rule 9(b) technically pertained only to IMS, D.Ct. Ruling at 17 & n.13, which, as indicated above, is no longer a party to this appeal. Ladas, however, had asserted all of his claims identically against all defendants; Power Solutions and Exelis, like IMS, had moved to dismiss pursuant to Rule 9(b); and the court's Rule 9(b) analysis was equally applicable to the claims Ladas asserted against Power Solutions and Exelis, as its quoted conclusions indicate.

Our reading of the Substitute Second Amended Complaint leads us to agree with those conclusion, and we thus affirm the dismissal of the action against Power Solutions and Exelis for failure to allege fraud with the requisite particularity.

18

C.  Denial of Leave To Amend Further

Finally, Ladas contends that the district court was required to allow him to file a further amended complaint to cure the Rule 9(b) deficiencies.  We are unpersuaded.

"A district court has broad discretion in determining whether to grant leave to amend, and we review such determinations for abuse of discretion." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000), cert. denied, 534 U.S. 826 (2001).  Leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), but "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party," Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008); see, e.g., Armstrong v. McAlpin, 699 F.2d 79, 93-94 (2d Cir. 1983) (in dismissing second amended complaint, the court did not abuse its discretion in refusing to allow "a fourth attempt to plead").

In denying Ladas's request for permission to amend in order to cure any Rule 9(b) deficiency, the district court stated that it had

> already granted Ladas the opportunity to amend his complaint. . . . Ladas filed
> numerous pleadings over a period of three years and is aware of the deficiencies
> in his pleadings.  Despite the opportunity to amend, he is unable to cure these
> deficiencies.  It is unlikely that another opportunity to amend will result in a
> well-pleaded complaint.

D.Ct. Ruling at 24.  The court's description finds ample support in the record.

Ladas filed his original complaint and his first amended complaint in mid-2010. Defendants moved in 2012--shortly after being served with process--to dismiss the amended complaint, contending, inter alia, that fraud was not pleaded with the particularity required by Rule 9(b).  Power Solutions and ITT argued that Ladas had "fail[ed] to identify a single false claim submitted to the government, or even one [device] sold to the [government] that did not meet contract specifications[

19

and] . . . . fail[ed] to identify a single false certification of compliance, express or implied." (ITT Defendants' Motion To Dismiss the Amended Complaint, dated March 1, 2012, at 2.) Ladas then moved to amend the amended complaint, and the district court granted that motion. Ladas eventually filed the Substitute Second Amended Complaint in late 2013. Defendants moved to dismiss the SSAC, and their arguments under Rule 9(b) were identical to the Rule 9(b) arguments made in support of their 2012 motions to dismiss the first amended complaint.

Thus, before filing the SSAC, Ladas was fully aware of the Rule 9(b) challenges to his pleading; he asked and received an opportunity to file a second amended complaint; his Substitute Second Amended Complaint failed to cure the Rule 9(b) deficiencies. In asking for leave to file yet another amended complaint, Ladas did not proffer or describe a proposed new pleading to cure the deficiencies. We see no abuse of discretion in the district court's denial of leave to amend further.

## CONCLUSION

We have considered all of Ladas's arguments on this appeal and, except to the extent indicated in Part II.A. above, have found them to be without merit. For the reasons stated above, the judgment dismissing the action is affirmed.